[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 115 
Martin Allen, the contestant in regard to a document purported to be the last will and testament of his stepmother, Nell Allen, appeals from a summary judgment entered in favor of the will's proponent, Bama Sconyers. Martin contended that that will was a product of undue influence by Sconyers, Nell's sister. Martin also argued that Nell lacked testamentary capacity to execute the will.
The dispositive issue is whether the trial court erred in determining that no genuine issue of material fact existed as to Sconyers's influence over Nell's execution of the will or as to Nell's testamentary capacity.
On a motion for summary judgment, the burden is initially on the movant to make a prima facie showing that there is no genuine issue of material fact (i.e., that there is no dispute as to any material fact) and that the movant is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.;McClendon v. Mountain Top Indoor Flea Market, Inc.,601 So.2d 957 (Ala. 1992); Elgin v. Alfa Corp., 598 So.2d 807 (Ala. 1992). "The burden does not shift to the opposing party to establish a genuine issue of material fact until the moving party has made a prima facie showing that there is no such issue of material fact." McClendon, at 958; Elgin, at 810-11.
Rule 56 is read in conjunction with the "substantial evidence rule," § 12-21-12, Ala. Code 1975, for actions filed after June 11, 1987. See Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794, 797-98 (Ala. 1989). In order to defeat a defendant's properly supported motion for summary judgment, the plaintiff must present substantial evidence, i.e., "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989). When reviewing a summary judgment, this Court considers the record in a light most favorable to the nonmovant and resolves all reasonable doubts against the movant. Carter v. Innisfree Hotel, Inc.,661 So.2d 1174 (Ala. 1995).
The record, viewed in a light most favorable to Martin, suggests the following facts:
In 1958 Nell married Joe Allen, who was already the father of two sons, Martin and Doug Allen, who were 10 and 11 years of age at the time. No children were born of Nell and Joe's marriage, but the record indicates an intimate familial relationship between Nell, Joe, and Joe's sons. According to a friend of the couple, Nell "treated those children as if they were hers and she called them their sons"; many of the couple's friends and acquaintances were unaware that Martin and Doug were not Nell's natural children. In 1971, Nell executed a will, devising her estate to Joe, but, in the event he predeceased her, then devising 40 percent of the estate to Martin and Doug; 10 percent each to Nell's sister-in-law Dorothy Allen and Nell's mother-in-law; 10 percent to Sconyers; and the remaining 30 percent to be divided among members of Nell's family.
Nell and Joe later retired and moved to Tyler, Texas. During the mid- to late 1980s, Nell's mental condition began to decline, and she began to exhibit symptoms of disorientation, confusion, and forgetfulness. During this same period, Joe was battling cancer. In 1990, Nell executed a new will. Among other bequests, Nell directed that Martin be given one half of the proceeds from the sale of her home if it was sold, various personal belongings, and approximately 20 percent of the residual estate. Doug was to receive approximately 18 percent of the residual estate, and Dorothy Allen was to receive approximately 25 percent. Sconyers and other persons on Nell's side of the family were to *Page 116 
receive a combined total of approximately 38 percent of the residual estate. Nell's medical records from this period noted that tests indicated the following:
 "depression, anxiety, passive dependent personality, . . . dementia. . . . Her mental status exam today demonstrates that she does not know the month or year. . . . Will need to rely on the Alzheimer's support group. . . ."
Evidence in the record indicates that by 1991 Nell's mental condition had severely degenerated. Martin testified:
 "By the summer of 1991, Nell Allen was fully incapable of taking care of her needs and required full-time care, which was provided by my aunt, Dorothy Allen, and certain [others]. Nell Allen was unable to prepare meals, remember to bathe or dress, and was disoriented to the point that she was unable to give simple directions to locations in her own neighborhood which she had visited regularly for years. She ceased to engage in activities she had always enjoyed, such as reading and socializing, and was withdrawn and reclusive. I personally experienced these events and observed them during regular visits to Tyler to visit Nell Allen."
On November 5, 1991, Joe died. A friend of Joe and Nell remembered the following:
 "The most dramatic [incident] was, I guess after Joe died, when her sister — and I assume that her other sister came to visit also at that time — they were at the funeral, and I walked in the door . . . and Nell met me and took me back to introduce me, you know, to the ladies, and when she got to her sister, Bama, she didn't know her name, and [Sconyers] just looked at me and . . . said, 'I'm her sister.' "
Less than two weeks later, Sconyers packed Nell's personal belongings and moved her to Sconyers's home in Clio, Alabama. Soon thereafter, Sconyers obtained a document purporting to give her power of attorney over Nell's business affairs. Sconyers cared for Nell in her home, including writing and signing correspondence, such as Christmas cards, in Nell's name. According to Sconyers, within two to three weeks after Nell arrived in Alabama she told Sconyers that she had signed the 1990 will against her wishes and asked her to get an attorney to change the will. Sconyers stated the following in regard to their visit to Boyd Whigham, a local attorney:
 "Q. [Did] Nell tell him what she wanted or did you tell him what Nell wanted?
 "A. She was there and heard it, and I told him she wanted to redo her will.
". . . .
 "Q. . . . Did [Whigham] ever talk to you without Nell in the room?
 "A. Well, if there was — if the door was open and she was sitting right on the outside she did. . . .
". . . .
 "A. When he made the will he talked to Nellie and Nellie alone.
". . . .
 "A. I wasn't after her money, I didn't go out there after her money."
Sconyers also testified that Martin and Dorothy Allen had "tried to frame [Nell] every way they could, and make her look crazy."
Nell executed the will now at issue on January 6, 1992. The will provided that Sconyers was to receive all of Nell's jewelry, furniture, and other personal items, as well as 50 percent of the residual estate. The other portions of the residual estate were devised to members of Nell's family. Nothing was devised to Martin, Doug, or Nell's sister-in-law Dorothy, although, as noted above, those three would have received a large percentage of the estate by the provisions of the 1971 and 1990 wills.
On January 14, 1992, Dr. Robert Zumstein examined Nell; he testified that she "impressed [him] as having Alzheimer's." He further testified that Nell "had some difficulty with the questions that were given to her, and a lot of the history was filled in by her sister too." Dr. Zumstein described Nell's condition as "variable, worse on some days than others." Nell lived with Sconyers until she entered a nursing home, where she died in December 1993 of a heart attack. Dr. Zumstein indicated on Nell's death certificate that the underlying cause of death was "advanced *Page 117 
Alzheimer's disease"; the death certificate indicated that the disease had existed for three years.
In support of her motion for summary judgment, Sconyers produced an affidavit from Whigham, who stated:
 "[Nell Allen was] alert, intelligent and competent. . . . [She] gave me written instructions concerning the Will which I reviewed with her item by item. In my opinion [Nell] was of sound mind and was not under undue influence."
 Undue influence
To establish a prima facie case of undue influence, the contestant must show that a confidential relationship existed between a favored beneficiary and the testator; that the beneficiary's influence was dominant and controlling in the relationship; and that there was undue activity on the part of the dominant party in procuring the execution of the will.Pruitt v. Pruitt, 343 So.2d 495 (Ala. 1976). A confidential relationship arises when one comes to rely upon and trust another in one's important affairs. Raney v. Raney, 216 Ala. 30,112 So. 313 (1927). The term "favored beneficiary" has been defined as:
 "One who, in the circumstances of the particular case, has been favored over others having equal claim to the testator's bounty. An unnatural discrimination, leading to a natural inference that advantage has been taken by one in position so to do; and shown to have been busy in getting such will executed."
Cook v. Morton, 241 Ala. 188, 192, 1 So.2d 890, 892 (1941). Whether the beneficiary was the dominant party in the relationship is usually a question of fact for the jury, and the jury may review the often circumstantial evidence as to whether there were controlling influences over the testator's behavior. Little v. Sugg, 243 Ala. 196, 8 So.2d 866 (1942);Pruitt, supra. Undue activity in the procurement or execution of a will may also be proved by circumstantial evidence.Sessions v. Handley, 470 So.2d 1164 (Ala. 1985).
We hold that genuine issues of material fact exist regarding whether Nell's 1992 will was the product of undue influence by Sconyers. The record is laden with evidence indicating a deterioration of Nell's mental processes, which would make her especially susceptible to undue influence. Nell's personal affairs were solely in the hands of Sconyers, who took care of her, wrote correspondence for her, and allowed her to live in her home; a jury could find that theirs was a "confidential relationship." Raney, supra. A jury could also determine from this evidence that Sconyers held controlling influences on Nell's behavior. Little, supra.
As noted above, the 1992 will was executed within days of Dr. Zumstein's examination of Nell, which appeared to indicate Alzheimer's disease. In light of the circumstances of this case, a jury could infer that the 1992 will's radical deviation from the bequests made in the 1990 will was the product of undue influence. We note that the evidence of Nell's mental deterioration and of her living situation conflicts with the evidence provided by Whigham's affidavit, in which he stated an opinion that Nell was "alert" and "intelligent." A jury could reasonably find that Nell's execution of the 1992 will, with its altered bequests, was due to her gratitude for Sconyers's care and came in reaction to Martin and Dorothy's alleged attempts to "make her look crazy." However, a jury could reasonably infer undue influence on Sconyers's part from Nell's failure to devise anything to Martin, Doug, and Dorothy Allen, when combined with the evidence of her health problems and her living situation. These are issues to be decided by the factfinder, not by the court on a summary judgment motion.
 Testamentary capacity
The law presumes that every person has the capacity to execute a will, and the burden is on the contestant to prove the lack of testamentary capacity. Bolan v. Bolan,611 So.2d 1051 (Ala. 1993). To possess testamentary capacity, one must be able to recall the property to be devised, the desired disposition of the property, and the persons to whom he or she wishes to devise the property. See Knox v. Knox, 95 Ala. 495,503, 11 So. 125, 128 (1892). In Fletcher v. DeLoach,360 So.2d 316 (Ala. 1978), the Court described in detail the broad evidentiary inquiry that must be made when testamentary capacity is at issue: *Page 118 
 " 'Evidence is competent to prove conduct and language at various times and places indicating an unhealthy mental condition, and the more extensive the view the safer is the determination reached.'
 "[Tucker v. Tucker, 248 Ala. 602, 610, 28 So.2d 637, 644 (1946).] Thus, evidence offered as to the mental and physical condition of the testatrix, either before or immediately after execution of the will, is admissible since it tends to indicate her condition when the will was signed. Likewise, testimony regarding the testatrix's 'conversations, deportment, acts, and appearance' has been found to be competent on the issue of testamentary capacity."
360 So.2d at 318 (citations omitted). The Fletcher Court also noted that the reasonableness of a will's provisions, when considered in light of the state of family relationships, may reflect on the testatrix's capacity to recall the objects of her bounty.
The record reveals genuine issues of material fact regarding Nell's testamentary capacity. As noted above, there is ample evidence that Nell was substantially impaired by Alzheimer's disease, which her death certificate indicated she had had for three years. Although we note that the 1990 will was also executed during the three-year period referred to by the death certificate, the validity of that will is not at issue. The evidence regarding Nell's actions, behavior, and health before and after the execution of the 1992 will could support an inference that Nell was without the ability to know and understand the consequences of the will at the time of its execution. Further, the reasonableness of Nell's distribution of her estate, which differed so strongly from the distribution provided for in her prior wills, could also be called into question by a jury, when considered in light of the evidence of her health problems.
Sconyers incorrectly argues that, as a general proposition, the testimony of the attorney who drafted and executed the will "holds far greater weight in determining a testator's mental state than any other evidence." While portions of attorney Whigham's affidavit are certainly valuable evidence of Nell's state of mind, that evidence must be weighed against the other evidence in support of Martin's claims. This shall be part of the factfinding responsibility of a jury in this case.
We further note that Sconyers heavily relies upon this Court's decision in Smith v. Vice, 641 So.2d 785 (Ala. 1994), in which this Court reversed a judgment based on a jury verdict in favor of the contestant in a will contest. However, the factual circumstances in Vice are in stark contrast with those of this case. In Vice, the testatrix had suffered from symptoms of mental illness that were aggravated by alcoholism. The record indicated a distinct reason for which the testatrix could have disinherited the contestant; the contestant, who was the testatrix's daughter, had had her arrested on a lunacy warrant only shortly before the will was executed. In the instant case, however, the record shows no evidence to demonstrate why Nell would have so radically changed her 1992 will from what she had written in 1990, other than assertions that the Allens were attempting to "make her look crazy." In further contrast to the evidence in Vice, the evidence in this case indicates that Nell's doctor examined her only eight days after she had executed the will and noted that Nell had Alzheimer's disease and was unable to answer questions without Sconyers's aid. The facts here are very different from those inVice; there is evidence that Sconyers brought Nell hundreds of miles from her home, took care of her, and even signed correspondence for her. Also, there is testimony that, only weeks before she executed the will, Nell had been unable to recall Sconyers's name. These facts, when considered in light of the distribution to be made by the 1992 will, make the questions of undue influence and testamentary capacity factual matters for a jury.
For the foregoing reasons, the judgment of the trial court is reversed, and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
ALMON, HOUSTON, KENNEDY, and BUTTS, JJ., concur. *Page 119