WRIGHT, Retired Appellate Judge.
The proponent of a will appeals a judgment on a jury verdict for the contestant. This appeal is before us pursuant to § 12-2-7(6), Code 1975.
Mary Will Fincher died in October 1994. Sue Fincher, the proponent, petitioned to have the will probated. John C. Baker, Jr., filed a contest, alleging that the will was invalid due to undue influence, lack of testamentary capacity, and fraud. The contest was transferred to the circuit court. A trial by jury ensued. After denying Sue Finch-er’s motion for a directed verdict, the trial court submitted the case to the jury. The jury returned a general verdict for Baker. Sue Fincher filed a motion for JNOV or for a new trial. The motion was denied. Sue Fincher appeals.
The dispositive issue on this appeal is whether Baker presented sufficient evidence to withstand Sue Fincher’s motions for a directed verdict and for JNOV.
Motions for directed verdicts and for JNOV test the sufficiency of the evidence in the same way. Berryhill v. Barnett, 590 So.2d 343 (Ala.Civ.App.1991). The standard of review is whether the nonmoving party has presented substantial evidence to support his position. Berryhill. If the nonmov-ing party has not, then a directed verdict is proper.
The record reflects the following:
Mary Will Fincher was married to Jack Fincher. They had two children, Jack and Rebecca. Mary Will’s husband, Jack, died in 1968. Her son, Jack, died in 1971. Jack was survived by his wife, Sue Fincher, and their three sons.
In 1972 Mary Will executed a last will and testament, leaving all her real estate and personal property to Rebecca. The residue of her estate was devised 1/2 to Rebecca, with the other 1/2 being equally divided between Jack’s three sons. Rebecca was named the executrix and trustee.
In 1972 the bulk of Mary Will’s estate was comprised of stock in a corporation, Genuine Auto Parts. The stock was valued at approximately $1,100,000. Her basis in the stock was less than one dollar per share. In 1972 the stock was valued at approximately $88 per share. Mary Will met with estate planners. To keep Mary Will from suffering tremendous tax consequences, the estate planners advised Mary Will to “sell” her shares to Rebecca under the terms of an installment sales contract.
In the course of the “sale,” Mary Will placed all her stock into Rebecca’s name and received two installment notes in return from Rebecca. The first note was in the amount of $539,500. The second note was in the amount of $575,843. The notes were payable to Mary Will at 5% interest per annum in equal monthly installments for 15 years.
In 1977 Rebecca renegotiated the installment notes. The renegotiation included two significant changes. The payout period was extended to 25 years, with the last payment date being May 1997. Rebecca also established two escrow accounts to pay the balance owed on the notes. The escrow accounts were invested in certificates of deposit at two banks. The banks agreed to pay Rebecca 8% interest per annum. Mary Will continued to receive only 5% interest per annum.
Following the 1977 renegotiation, Mary Will executed a codicil, amending her 1972 will. The codicil provided that if Mary Will died before the last payment in 1997, the principal and the interest on the installment *3 notes would be paid to Rebecca for her lifetime. Upon Rebecca’s death, the remainder would be equally divided between Rebecca’s children and Jack’s children. The remainder of the 1972 will remained intact.
In 1978 Rebecca died. She was survived by her son, John Baker, and her daughter, Jackie House. Rebecca’s estate was divided between her two children. The children inherited Rebecca’s remaining 3,000 shares of common stock in Genuine Auto Parts. They also stood to inherit the remainder of the excess balance in the escrow accounts. The remaining balance would be paid in 1997.
On July 29, 1978, nineteen days after Rebecca’s death, Mary Will executed a new will. All tangible property was to be divided 1/2 to Rebecca’s children and 1/2 to Jack’s children. Mary Will’s residence was bequeathed to Jackie House, and an adjoining house was bequeathed to John Baker. The residue of the estate was devised 1/2 to Rebecca’s children and 1/2 to Jack’s children. Sue Fincher was named executrix and trustee and was also given a power of attorney.
In January 1981 Mary Will executed a codicil to her 1978 will. The codicil devised Mary Will’s residence equally to Jackie House and to "John Baker. The adjoining house was devised equally to Jack’s three sons.
On October 30, 1981, Jackie House committed suicide. She was survived by her husband, Buddy House, and two children.
On November 23, 1981, Mary Will executed a new will to reflect the changed circumstances. Mary Will’s residence was devised equally to John Baker and to two of Jack’s sons. The adjoining house was devised to Jack’s third son. The residue of the estate was devised equally to John Baker and to Jack’s three sons. The purpose of the 1981 will was to omit any reference to Jackie House.
Mary Will executed a codicil on December 7, 1981. The only amendment was that her residence was to be equally devised to two of Jack’s sons.
During Christmas 1981, Buddy House made it known to Mary Will that he was not pleased that his and Jackie’s two children had not been mentioned in Mary Will’s new will.
On January 5, 1982, Mary Will visited her doctor, Dr. Willis Israel. Dr. Israel made the following notation in. Mary Will’s file:
“According to [Mary Will], Buddy was very upset w/her & left early Christmas after having lunch w/her, did not leave the grandchildren. He was upset w/her because she had not named his 2 children specifically in her will after Jackie’s death and got real snotty.”

The Execution of the January 19, 1982, Will

Due to the episode in December 1981, Mary Will apparently decided to take precautionary steps to ensure that her will would survive a contest. The provisions contained in the November 1981 will, as amended by the December 1981 codicil, were reaffirmed in a new will executed on January 19, 1982. It is this will that is at issue on this appeal.
On the day of the execution of the 1982 will, Mary Will was examined by Jerry By-num, an employee of Cheaha Mental Health Center. Bynum found that Mary Will’s concrete and abstract thought processes were intact, that she was functioning at an appropriate level for her chronological age, and that there was no indication of any mental impairment which would interfere with her ability to make decisions. A court reporter transcribed Bynum’s interview with Mary Will. That transcription is a part of the record on appeal.
Mary Will’s attorney explained the provisions of the will to Mary Will. He then asked her whether she intended to exclude Jackie House’s children from her estate. Mary Will answered in the affirmative, stating, “I’m not putting any or having to assume the responsibilities of any of the third generation in anything.” This interview with her attorney was also transcribed.
The will was executed in the presence of four witnesses. An attempt to have the interviews and the execution videotaped was made. Due to a technical problem, no videotape exists.
*4 On January 22,1982, Mary Will visited Dr. Israel. His notes reflect the following:
“This pt. is very definitely doing better. Her BP has dropped. She has been on a low salt diet. She has had lawyers attest to her soundness of mind & has it recorded. No problems. Heart & Lungs are clear. She is to return in a month.”

The Execution of the June 8, 1982, Codicil

Sometime during the summer or fall of 1981, Rebecca’s co-executors cashed in the 8% certificates of deposit and obtained market interest rates of 12% to 14% on the reinvestment of the cash sums. The 12% to 14% interest received by Rebecca’s estate continued to pour into the escrow accounts, from which Mary Will was paid her 5% installment obligation. In 1997 Jackie House’s two children and John Baker would divide the excess balance created by the 12% to 14% interest.
In December 1981 Mary Will determined that she should be paid the balance owed to her on the two installment notes in order that she could invest the money and earn a return higher than the 5% interest that she was presently earning.
• She contacted one of Rebecca’s co-executors, J. Gorman Houston, and demanded immediate payment in full of the balance due to her. Houston forwarded Mary Will’s letter to John Martin, the senior trust officer for Central Bank, which was serving as Rebecca’s other co-executor.
John Martin subsequently met with Mary Will and explained to her that because the bank was not in default, she was not entitled to her demand. He further explained that her 5% interest rate was locked in for the duration of the installment sales contract. Mary Will was not satisfied with Martin’s representations.
Mary Will instructed her attorney to file an action against Rebecca’s estate, seeking to have the co-executors pay in full the two installment notes. The action, which was filed in May 1982, was ultimately dismissed.
By June 1982, after realizing that she would be unable to get the money back from Rebecca’s estate, Mary Will requested that her attorney prepare a codicil to her 1982 will. Under the terms of the codicil, John Baker was to be omitted as a residuary devisee. Her attorney testified-that Mary Will wanted this change because Jackie House’s two children and John Baker had already received, or were going to receive, more from her “estate” than Jack’s three sons would receive upon her death.
Mary Will executed the codicil on June 8, 1982. The effect of the codicil was to omit John Baker as a residuary devisee.
Prior to the execution of the codicil, Mary Will met with Dr. Israel. His June 2, 1982, notation concerning that visit reflects: “She is doing beautifully. ... She will be 82 years old soon in July.” She again met with Dr. Israel on July 23, 1982. His notes from that visit reflect: “This patient is getting ready to make her annual pilgrimage to Gat-linburg. Heart & Lungs are clear. No problems .... ”
First, Sue Fincher asserts that Baker failed to present sufficient evidence of Mary Will’s lack of testamentary capacity.
It is presumed that every person has the capacity to execute a -will. Smith v. Vice, 641 So.2d 785 (Ala.1994). The burden is on the contestant to prove the lack of testamentary capacity. Vice. If the testatrix knows her estate and to whom she wishes to give her property and understands that she is executing a will, she has testamentary capacity. Vice. The contestant has the burden of showing that the testatrix was incapacitated at the time the will was made. Vice. Insanity prior to that time, unless of a permanent nature, raises no presumption of insanity at the time the will was executed. Vice.
Baker produced evidence relating to Mary Will’s mental capacity in September 1979 and January 1980. In September 1979 Dr. Israel noted, “The patient is just not responsible anymore for what she does or thinks. She has advanced arterial sclerotic brain disease, but is functioning fairly well.” Mary Will was admitted to the hospital in January 1980. At that time Dr. Israel noted that Mary Will suffered from “Chronic cere- *5 brovaseular insufficiency with repeated transient ischemic attacks (TIAs) and brain damage with total confusion and incompetence
Dr. Israel’s deposition and his medical records were admitted into evidence. In his deposition Dr. Israel explained that the September 1979 and January 1980 episodes were customary for a person suffering from TIAs. He further explained, “usually with a person that gets confused like this and incompetent it clears up and the TIA clears up.”
Commencing with Mary Will’s discharge from the hospital in January 1980, Dr. Israel’s records detail an uninterrupted period of good health for Mary Will, which existed at the time she signed her 1982 will and its amending codicil. In fact, Dr. Israel’s medical records on Mary Will are replete with notations of her good health during the relevant period.
On January 22, 1982, three days after Mary Will executed the 1982 will, Dr. Israel noted in his records that Mary Will had “no problems.” Six days prior to the execution of the 1982 codicil, Dr. Israel noted in his records that Mary Will “is doing beautifully.” On July 28,1982, Dr. Israel noted that Mary Will was “getting ready to make her annual pilgrimage to Gatlinburg. ... No problems.”
It appears that the occurrences of September 1979 and January 1980 were remote and isolated episodes. They in no way reflect Mary Will’s mental capacity at the time she executed the 1982 will and the amending codicil.
Mary Will, concerned that her will would be contested, took extra precautions in securing its execution. Those precautions included the examination of Mary Will by a mental health expert, the transcription of the interview and the proceedings, the utilization of four witnesses, and an attempt to videotape the signing.
Baker makes much ado about the fact that in the transcript, Mary Will did not know her actual age or how many great-grandchildren she had. Our review of the transcript reveals that these factual assertions made by Baker are taken out of context. These isolated factual matters in no way establish the mental incapacity of Mary Will. Even Dr. Israel testified that he had problems remembering how many grandchildren he had.
We find that Baker failed to present substantial evidence to support his claim of incapacity. The trial court erred in allowing the issue to go to the jury.
Second, Sue Fincher asserts that Baker failed to present substantial evidence to support his claim of undue influence.
In his complaint Baker alleged that Mary Will’s 1982 will and amending codicil were procured by undue influence exercised by Sue Fincher, acting alone or in concert with her three sons.
The elements necessary to raise a presumption of undue influence are: (1) a confidential relationship between a favored beneficiary and the testator; (2) a dominant and controlling influence by the beneficiary over the testator; and (3) undue activity in procuring execution of the will. Allen v. Sconyers, 669 So.2d 113 (Ala.1995).
. Sue Fincher is not a “favored beneficiary” as that term has been defined in Cook v. Morton, 241 Ala. 188, 1 So.2d 890 (1941). Therefore, we must determine whether Sue Fincher, acting in concert with her sons, exercised undue influence over the execution of Mary Will’s 1982 will and amending codicil.
There is no dispute that a confidential relationship existed between Sue Fincher, her sons, and Mary Will. However, there was no evidence adduced that Sue Fincher and her sons had a dominant and controlling influence over Mary Will. From our review of the record, it appears that Mary Will was a very strong-willed lady, who was capable of taking care of her own business. Furthermore, there was no evidence adduced at trial that Sue Fincher and her sons were involved in any undue activity in procuring the will and the amending codicil. The fact that Sue Fincher was given a power of attorney after Rebecca’s death, and the fact that she exercised control over Mary Will’s finances, does not give rise to a presumption of undue *6 influence. Hall v. Hall, 502 So.2d 712 (Ala.1987).
We find that Baker faded to present substantial evidence to support his claim of undue influence. The trial court, therefore, erred in allowing that issue to go to the jury.
Last, Sue Fincher asserts that Baker failed to present substantial evidence to support his claim of fraud and deceit.
Baker’s claim of fraud and deceit relates to Mary Will’s execution of the 1982 codicil, wherein he was omitted as a residuary devi-see. The alleged fraud is premised upon the assertion that Mary Will relied upon Sue Fincher’s statement that John Baker was profiting from the excess interest earned on investments held in the escrowed accounts.
There is a conflict in the evidence as to whether Sue Fincher made this statement to Mary Will. Regardless of the conflict, we fail to find any falsity in the statement.
There is no dispute that in 1982, the interest rate differential was providing a vested economic benefit for Jackie House’s two children and for Baker. Although Baker would not receive the benefits of the interest rate differential until 1997, at the time of the execution of the 1982 codicil, he held a vested 50% interest in the balances held in the escrow accounts.
Under the circumstances, we fail to see how the alleged statement could serve as the basis to support Baker’s claim for fraud and deceit. The trial court erred in allowing the issue to go to the jury.
We find that Baker failed to present substantial evidence to support his claims of incapacity, undue influence, and fraud. The trial court should have directed a verdict in favor of Sue Fincher on all issues. The failure of Baker to produce substantial evidence to support any of the issues claimed requires reversal of the judgment denying the motions for a directed verdict and for JNOV. Therefore, the judgment of the trial court is reversed and rendered.
The foregoing opinion was prepared by Retired Appellate Judge L. Charles Wright while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975.
REVERSED AND JUDGMENT RENDERED.
ROBERTSON, P.J., and THIGPEN, YATES, and CRAWLEY, JJ., concur.
MONROE, J., dissents.