This court's opinion of September 14, 2007, is withdrawn, and the following is substituted therefor.
Kimberly Bailey and Sherrill Pearson filed a complaint against Charles Sawyer ("Charles"), contesting Mary Frances Sawyer's will and two deeds that she executed on May 6, 2002. Based on a jury verdict, the trial court entered a judgment in favor of Charles. Bailey and Pearson appeal, assigning as error the trial court's denial of their motion for a new trial and the trial court's failure to give their requested jury instruction. Charles cross-appeals, challenging the trial court's denial of his motion for attorney fees.
 Facts
Mary Frances Sawyer was married to Clarence Sawyer; they had two children, Charles Sawyer and Clarence Wayne Sawyer ("Wayne"). Charles, the older son, had three sons, Jeff, Jason, and Jeremy. Wayne had two daughters, Kimberly Bailey and Sherrill Pearson. Mary Frances lived in Fayette on what was referred to as "the Studdard property," where she had grown up, until the time of her death in May 2002.
Mary Frances had a brother, Mason Studdard, who lived with Mary Frances until his death in 1998. Charles lived next door to Mary Frances and visited her every day for approximately 35 years. In addition to Mary Frances's home and Charles's home, there was another house, which had been remodeled ("the remodeled house"), and a mobile home situated on the Studdard property. Bailey was raised in Forestdale, approximately 45 minutes away from Mary Frances's home. However, Bailey testified that she and Mary Frances maintained a very close relationship throughout Mary Frances's life and that Bailey had visited Mary Frances often.
In October 1994, Mary Frances conveyed by deed one and one-half acres of the Studdard property, including the remodeled house, to Charles's son, Jeff, and his wife. Jeff and his wife took out a mortgage on that property in September 1995. According to Bailey, Wayne had intended to move into the remodeled house in 1997, after Jeff and his wife had moved out of the house, and Wayne had begun to do some work on the house to that end. In September 1997, however, Wayne received a letter from an attorney on behalf of Jeff and his wife, instructing him to cease all work that he was planning to do to the house and to remove all property that he had located on the land. Bailey testified that Mary Frances was upset when she learned of the mortgage on the house and that Mary Frances was upset with Jeff because "she was scared that she would lose some of the Studdard land."
On December 10, 1997, Bailey drove Mary Frances to attorney Charles Stephens's office, where Mary Frances executed a will that left her entire estate to Wayne. The December 1997 will also stated that if Wayne predeceased her, then all of her property would pass to Bailey. At the time Mary Frances executed the 1997 will, she did not own the entirety, but only a portion, of the Studdard property.
The mortgage entered into by Jeff and his wife was satisfied in February 1998. In October 1998, Jeff and his wife conveyed the land with the remodeled house back to Mary Frances. Mason died in December 1998; Mason left a will, in which he named Charles as the executor and left a portion of his estate to Mary Frances. After Mason died, Mary Frances owned the entirety of the Studdard property, which encompassed approximately 250 acres. *Page 728 
On March 26, 1999, Bailey drove Mary Frances to Stephens's office, where Mary Frances executed a new will, leaving all of her property to Wayne and Charles, or to their surviving issue, in equal parts. Wayne died on September 24, 2001. Charles testified that he did not know of the December 1997 will or of the March 1999 will until the time of trial.
On March 5, 2002, Charles drove Mary Frances to Stephens's office. Charles testified that he had sat with Mary Frances while she had discussed a proposed will with Stephens, that she had taken a note with her that she handed to Stephens at the meeting, but that she had not executed a new will or signed any documents that day.
Stephens testified in his deposition that he had followed his standard procedure with Mary Frances: he met with her to obtain the information necessary for drafting any documents, he drafted the documents, and he then met with her at a later date, after she had had an opportunity to review the documents, before having her execute the documents. Stephens also testified in his deposition that Mary Frances had wanted to distribute her property via her will but that she had wanted a number of restrictions put on the proposed devises that would have violated the rule against perpetuities. Stephens testified that he had advised Mary Frances that she could not use certain restrictions in her will and that she had ultimately "decided to do it by deed." According to Stephens, Mary Frances "deeded out the property the way she wanted it to go," and then she decided to make her will, leaving everything that remained to Charles. Stephens testified that Mary Frances had expressed her desire to keep the Studdard property in the family. Bailey testified that Mary Frances had expressed to her throughout her life that she wanted the Studdard property to be divided between Charles and Wayne equally and that she wanted to keep the land in her family.
Bailey testified that Mary Frances had been in poor health after Wayne died in September 2001, that Mary Frances had been legally blind since the early 1990s, and that Mary Frances had been unable to drive an automobile because of her blindness. Additionally, Bailey testified that Mary Frances did not have a full understanding of her financial situation and holdings when Wayne died. Bailey testified that on March 9, 2002, Bailey and Pearson, along with several other family members, were present at Mary Frances's home; Mary Frances had made a notation in her calendar of this visit as well. According to Bailey, Mary Frances told Bailey during that visit that she was concerned that Bailey and Pearson were going to "sell or get rid of all the personal items belonging to Wayne and his wife and that they would sell the Studdard property if they ever owned it. Bailey testified that after she and Mary Frances had a conversation about those concerns, Mary Frances understood that Bailey and Pearson would not sell the land and that, thereafter, Bailey and Mary Frances had continued to have a close relationship. Bailey testified that, at that time, Mary Frances's physical condition was worsening, that Mary Frances was coughing a lot, losing weight, and. suffering from pulmonary problems, and that Mary Frances was having difficulty talking because of shortness of breath.
On April 24, 2002, Mary Frances was admitted to Walker Baptist Medical Center. After that hospital visit, Bailey testified, Mary Frances's health did not seem to improve and she required an oxygen tank.
Charles testified that on May 6, 2002, he drove Mary Frances to a doctor's appointment. According to Charles, Mary Frances *Page 729 
also had an appointment with Stephens on that same day. Stephens testified in his deposition, however, that his appointment calendar did not reflect that he had had an appointment scheduled with Mary Frances on May 6. Charles testified that the doctor had told Mary Frances that she needed to go to the hospital, that they had stopped at Stephens's office on the way to the hospital, and that Mary Frances had gone into Stephens's office to sign the documents purportedly discussed in March. Stephens testified in his deposition that it was typical for a client to discuss their wishes with him and that he would have the documents prepared approximately two months later. Mary Frances executed two deeds on May 6, 2002, one conveying eight acres to Bailey and Pearson, and the other conveying the remainder of her land to Charles. According to Stephens, he reviewed with Mary Frances the property that the deeds conveyed, making sure that the deeds reflected what she wanted to do, before she executed those deeds.
Stephens also described the process by which execution of a will typically occurred, which included Stephens's asking the testator whether they had had an opportunity to look over the will, asking the testator what they intended as their will, and asking the testator whether they understood the contents of their will. According to Stephens, he completed this process with Mary Frances on May 6, 2002, in front of two witnesses and, afterwards, Mary Frances executed her will, leaving the remainder of her property to Charles. Stephens testified that, based on his familiarity with Mary Frances, he believed that she was aware of all the assets that she had disposed of on May 6. He testified that he did not remember her appearance being any different on that day than at other times when she had visited his office, that she did not appear to be confused, and that she knew what she was conveying.
After visiting Stephens's office, Mary Frances returned to the hospital on May 6, 2002. According to Charles's testimony and hospital records, Mary Frances checked herself into the hospital. Bailey testified that, on May 6, 2002, Mary Frances was straining to breathe and was disoriented but was aware of the people visiting her. Charles testified that he did not find Mary Frances to be of unsound mind or mentally incompetent at any time up until her death.
According to Bailey, while Mary Frances was in the hospital, she told Bailey that she had signed some papers in March and that she wanted to change what she had signed. On May 9, 2002, Mary Frances was discharged from the hospital, and she returned home, where she stayed until she died on May 24, 2002. At some time before Mary Frances died, Charles returned to Stephens's office and picked up the will and the deeds Mary Frances had executed on May 6; he then recorded the deeds on May 20, 2002. Charles testified that he had told Bailey and Pearson about the deeds on September 24, 2002.
 Procedural History
On December 19, 2002, Bailey and Pearson filed a complaint against Charles, contesting Mary Frances's will in the Fayette Probate Court. In their complaint, Bailey and Pearson asserted that Mary Frances "was of unsound mind and mentally incompetent and did not possess testamentary capacity to make and execute a will on the 6th day of May, 2002." Additionally, they alleged that the will was procured through undue influence exercised upon Mary Frances by Charles. The will-contest proceedings were transferred to the Fayette Circuit Court. *Page 730 
Charles filed an answer on January 27, 2003. Bailey and Pearson filed an amended complaint on August 5, 2004, in which they added a claim contesting the two deeds executed by Mary Frances on May 6, 2002, one of which conveyed over 200 acres of real property to Charles and one which conveyed 8 acres of real property to Pearson and Bailey. They argued that, at the time those deeds were executed, Mary Frances did not have sufficient capacity to understand the nature and consequences of her acts and that her signature on the deeds had been procured through undue influence exercised upon her by Charles.
On August 22, 2005, this case was presented to a jury in the Fayette Circuit Court. At trial, after Bailey and Pearson had presented their case-in-chief, Charles made a motion for a judgment as a matter of law; that motion was denied. On August 25, 2005, the jury submitted a verdict sustaining the will and the deeds. Charles filed a motion to tax costs and attorney fees on September 13, 2005. On September 22, 2005, Bailey and Pearson filed a motion for a judgment as a matter of law, a motion for a new trial, and a response to Charles's motion to tax costs and attorney fees. On December 14, 2005, the trial court entered a judgment on the jury's verdict sustaining the will and the deeds and denied Charles's motion for attorney fees. Bailey and Pearson filed renewed motions for a judgment as a matter of law and for a new trial on December 29, 2005. Both motions were denied on December 30, 2005. Bailey and Pearson appeal, and Charles cross-appeals.
 Discussion
Bailey and Pearson first argue that the trial court exceeded its discretion in failing to grant their motion for a new trial.
 "The decision to grant or to deny a motion for a new trial rests within the sound discretion of the trial court. Hill v. Cherry, 379 So.2d 590
(Ala. 1980). A denial of a motion for a new trial strengthens the presumption of correctness afforded a jury verdict, Osborne v. Cobb, 410 So.2d 896
(Ala. 1982), and the decision of the trial court will not be disturbed unless the verdict is against the preponderance of the evidence or is clearly wrong or unjust. Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1252 (Ala. 1987); see also Shiloh Constr. Co. v. Mercury Constr. Corp., 392 So.2d 809 (Ala. 1980)."
Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 73
(Ala. 2001). Bailey and Pearson argue that the judgment in this case was not sustained by the evidence and was plainly and palpably wrong and manifestly unjust because the will and the deeds executed by Mary Frances on May 6, 2002, were the result of undue influence exerted on her by Charles and are, therefore, invalid.
The Alabama Supreme Court has stated:
 "`To establish a prima facie case of undue influence, the contestant must show that a confidential relationship existed between a favored beneficiary and the testator; that the beneficiary's influence was dominant and controlling in the relationship; and that there was undue activity on the part of the dominant party in procuring the execution of the will. A confidential relationship arises when one comes to rely upon and trust another in one's important affairs. The term "favored beneficiary" has been defined as:
 "`"One who, in the circumstances of the particular case, has been favored over others having equal claim to the testator's bounty. An unnatural discrimination, leading to a natural inference that advantage has been taken *Page 731 
by one in position so to do; and shown to have been busy in getting such will executed."
 "`Cook v. Morton, 241 Ala. 188, 192, 1 So.2d 890, 892 (1941). Whether the beneficiary was the dominant party in the relationship is usually a question of fact for the jury, and the jury may review the often circumstantial evidence as to whether there were controlling influences over the testator's behavior. Undue activity in the procurement or execution of a will may also be proved by circumstantial evidence.'"
Ex parte Helms, 873 So.2d 1139, 1148 (Ala. 2003) (quoting Allen v. Sconyers, 669 So.2d 113, 117
(Ala. 1995)). To prove undue influence with respect to a deed, however, the only elements that must be demonstrated are "(1) that a confidential relationship existed between the donor and the beneficiary, and (2) that the beneficiary has exercised a dominant and controlling influence over the donor." Hayes v.Apperson, 826 So.2d 798, 805 (Ala. 2002) (citing Exparte Henderson, 732 So.2d 295, 298-99 (Ala. 1999)). Bailey and Pearson argue that Charles possessed a confidential relationship with Mary Frances and that he "exercised a dominant and controlling influence" over Mary Frances based on his visiting her every day, buying her groceries, mowing her lawn, and assisting her with her banking, among other factors.
Several factors will support a finding that the beneficiary's influence was dominating and controlling in the relationship. The Alabama Supreme Court "has held on numerous occasions that the fact that a beneficiary controls the personal, business, and household affairs of a testator is evidence of a dominant and controlling influence." Hayes v. Apperson,826 So.2d at 804. There was evidence presented indicating that, before Mary Frances died, Charles assisted her by going to the grocery store at times, by delivering bills after Mary Frances had written out the checks therefor, and by driving her where she needed to go.
In Thorn v. Taylor, however, this court stated:
 "`It is well settled that one alleging dominance of a child over a parent must prove that "time and circumstances have reversed the order of nature, so that the dominion of the parent has not merely ceased, but has been displaced, by subservience to the child." . . . Black's Law Dictionary 486 (6th ed. 1990) defines "dominate" as "[t]o master, to rule, or to control." Thus, for the burden of proof to shift, it is clear that our cases require proof of more than a reversal of the traditional roles of parent as care giver and child as care recipient; they require proof that the parent's will has become subordinate to the will of the child. It is also clear from our cases that the mere relationship of parent and child alone, even when coupled with some activity on the part of the child in securing the preparation of legal papers for the parent, is not sufficient to prove subservience on the part of the parent, so as to shift to the child the burden of proving an absence of undue influence.'
"[Wilson v. Wehunt,] 631 So.2d [991] at 993 [(Ala. 1994)] (emphasis in original). The court continued:
 "`The evidence is undisputed that the [son] helped his mother write her checks and handle her affairs and arranged to have the deed prepared and * her signature notarized. However, as previously discussed, evidence of this nature, without more, is simply not sufficient to justify a finding of subservience on the part of the parent, so *Page 732 as to create a legal presumption of undue influence.'
 "631 So.2d at 994 (emphasis added)."
679 So.2d 1120, 1122 (Ala.Civ.App. 1996).
The jury's finding that Charles's influence over Mary Frances was not dominating and controlling such that he unduly influenced her in signing the will and the two deeds is supported by the record. There was evidence presented indicating that Mary Frances was a very independent woman, that she took care of her own financial affairs, and that she was aware of and knew those around her, even in the last few weeks of her life. Additionally, Stephens testified in his deposition that in March 2002 Mary Frances had delivered written instructions to him, specifically instructing Stephens how she wanted her property divided. There was no evidence presented indicating that Charles had been active in the execution or preparation of the will or the two deeds at issue, but for the evidence of his having driven Mary Frances to Stephens's office and Bailey's testimony that Charles had led Mary Frances to believe that Bailey and Pearson would dispose of the Studdard property if it was left to them. There was additional testimony, however, indicating that Mary Frances had been displeased with the manner in which Bailey and Pearson had managed Wayne's personal property after his death, which the jury could have determined to be the cause of Mary Frances's ultimate distribution of her land. Because the question whether the beneficiary was the dominant party in the relationship is usually a question of fact for the jury and because the record supports the jury's finding, we conclude that the trial court's decision to deny Bailey and Pearson's motion for a new trial was neither against the preponderance of the evidence nor clearly wrong or unjust.
Bailey and Pearson next argue that the trial court committed reversible error in failing to give their requested jury instruction number 8, which stated, "A radical change from the bequests of previous wills raises the inference that a subsequent will was the product of influence."
In Shoals Ford, Inc. v. Clardy, 588 So.2d 879
(Ala. 1991), the Alabama Supreme Court stated:
 "In a jury case, a party is entitled to have its case tried to a jury that is given the appropriate standard by which to reach its decision, and a wrongful refusal of a requested jury charge constitutes a ground for a new trial."
588 So.2d at 883. According to Rule 45, Ala. R.App. P.:
 "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
In support of their argument that the trial court erred in failing to give their requested jury instruction, Bailey and Pearson cite Allen v. Sconyers, 669 So.2d at 117.
Unlike the present case, the appeal in Allen was from a summary judgment. The testatrix in Allen was survived by her sister, a sister-in-law, and two stepsons, among others.669 So.2d at 115. The testatrix executed a will in 1971, leaving 40 percent of her estate to her stepsons, 10 percent each to her sister and to her sister-in-law, and the remainder to other members of her family. 669 So.2d at 115. *Page 733 
The testatrix's mental condition began to decline during the mid to late 1980s. Id. In 1990, the testatrix executed a new will, again directing that a significant amount of her estate should pass to her stepsons, and giving a portion of her residual estate to her sister-in-law and other family members.669 So.2d at 116. In late 1991, the testatrix was incapable of caring for herself, and she moved to her sister's home, where her sister cared for her. Id. In 1992, the testatrix's sister arranged a meeting with an attorney, during which the testatrix executed her final will; that will provided that her sister would receive all of her jewelry, furniture, and personal items, as well as 50 percent of the residual estate.Id. Nothing was devised to the testatrix's stepsons or to her sister-in-law, Id. Approximately one week after the testatrix executed her final will, a doctor testified that she "`impressed [him] as having Alzheimer's."' Id.
In reversing the summary judgment in Allen, our supreme court noted that a jury could infer "that the 1992 will's radical deviation from the bequests made in the 1990 will was the product of undue influence" by the testatrix's sister and that there was conflicting evidence regarding the testatrix's mental deterioration and living situation. 669 So.2d at 117. The court also stated that a jury could reasonably find that the testatrix had executed the 1992 will because of her gratitude for her sister's care and as a reaction to other potential problems that she had had with her stepsons. Id. The court then stated that "a jury could reasonably infer undue influence on [the testatrix's sister's] part from [the testatrix's] failure to devise anything to [her stepsons or to her sister-in-law], when combined with the evidence of her health problems and her living situation." Id. Finally, the court stated that those were "issues to be decided by the factfinder, not by the court on a summary judgment motion."Id.
In Hayes v. Apperson, supra, the testatrix and her brother had executed joint wills in which they left their entire estates to the survivor, with the survivor's estate going to their church on the survivor's death. 826 So.2d at 800. The testatrix's stepson took care of her and her brother for many years up until their deaths, and the stepson testified that they both had depended on the stepson fully. Id.
Approximately nine years after the testatrix and her brother executed their joint wills, they both executed a power of attorney in favor of the stepson. Id. Later, while the testatrix was in the hospital, the stepson produced a handwritten will, purportedly signed by the testatrix; the handwritten will left a life estate to the testatrix's brother, with the remainder to the stepson. Id. Subsequent to the stepson's production of the handwritten will, the stepson drafted additional wills for the testatrix and her brother, both of which left their entire estates to the stepson, as well as a deed giving the stepson an interest in land owned jointly by the testatrix and her brother. Id. The stepson arranged for the testatrix and her brother to execute the new wills and the deed. Id.
The testatrix died approximately one month after the new wills and the deed had been purportedly signed. 826 So.2d at 802. When the testatrix's brother learned that the will of the testatrix that was being probated was not the joint will they had executed, he executed a new will, again leaving his entire estate to his church. 826 So.2d at 802. The testatrix's brother filed a will contest, challenging the testatrix's new will and the deed; he argued at trial that "both the will and the deed were products of undue influence exerted by [the stepson] over [the testatrix]." Id. The *Page 734 
trial court found for the stepson, holding that both the will and the deed were valid and finding that the stepson had not exerted undue influence over the testatrix to get her to execute both documents. Id.
Our supreme court reversed the trial court's judgment holding that the testatrix's execution of the deed and the will was not the product of the stepson's undue influence. 826 So.2d at 802. As part of the discussion regarding its decision to reverse, the court stated:
 "Not only did [the testatrix] depend on [her stepson] in her business affairs, but [her stepson] testified that she also depended on him in personal matters and matters pertaining to her health. [The testatrix] became increasingly weak as her renal disease progressed; she was almost bedridden. She depended on [her stepson] to take her to the doctor. In fact, [the stepson] testified that she was `totally dependant' on him when she reached this state. Total dependency by a testator on the favored beneficiary is again evidence of a dominant and controlling influence. [Ex parte] Baker, 709 So.2d [7] at 9
[(Ala. 1997)].
 "We hold that the evidence presented at trial indicates that [the stepson] was controlling and dominant in his relationship with [the testatrix]. [The stepson] had control over [the testatrix's] financial and business affairs. She depended on him fully to handle these matters.
 "Furthermore, the radical deviation from [the testatrix's] previous testamentary scheme, which benefitted her brother and her church, to a new scheme, which benefitted only [her stepson], evidences undue influence by [the stepson]. See Allen [v. Sconyers], 669 So.2d [113,] 117 [(Ala. 1995)] (a radical change from the bequests of previous wills raises the inference that a subsequent will was the product of undue influence). . . .
 ". . . .
 "Each fact standing alone in this case would not prove undue influence. However, as indicated above,* we look at each fact in the context of all of the evidence and the other elements of undue influence to determine if the three-pronged test of undue influence has been met."
826 So.2d at 804-05.
The Allen court determined that undue influencecould be inferred from a radical change from the bequests of previous wills, particularly in light of other surrounding circumstances, and that such a question should be presented to the jury, rather than disposed of by a summary judgment. Viewed in isolation, the parenthetical used by theHayes court to explain the relevance of Allen
appears to extend the holding in Allen by declaring that a radical change from the bequests of previous wills raises the inference that a subsequent will was the product of undue influence. When taken in context, however, the Hayes
court's explanation of Allen is used only to support the conclusion that a radical change from the bequests of previous wills could raise the inference that a subsequent will was the product of undue influence when viewed alongside the remaining evidence. As is made clear by Hayes, the jury must look at each fact in the context of all the evidence.
We do not agree that Bailey and Pearson's requested jury instruction is a correct statement of the law as derived fromAllen or Hayes and, therefore, Bailey and Pearson were not prejudiced by the trial court's failure to give their requested instruction. Rather, the Allen court merely found that undue influence could be inferred from a radical change from the bequests of previous wills, particularly in light of other surrounding circumstances, *Page 735 
and that such a question should be presented to the jury, rather than disposed of by a summary judgment. In the present case, the question whether the discrepancies between the final will and the other two wills executed by Mary Frances were the result of undue influence was presented to the jury as Allen
directed. We conclude, therefore, that the trial court did not err in failing to give Bailey and Pearson's requested jury instruction number 8.
Charles's cross-appeal challenges the trial court's failure to award him attorney fees. Charles argues that § 43-8-196, Ala. Code 1975, entitles him to recover attorney fees. Section 43-8-196 provides:
 "The costs of any contest under the provisions of this article must be paid by the party contesting if he fails; otherwise, it must be paid by the plaintiff or out of the estate, or in such proportion by the plaintiff or out of the estate as the court may direct; and for the costs directed to be paid by the plaintiff or defendant, execution may be issued as in other cases; and the costs directed to be paid out of the estate may be collected as other claims against an estate are collected."
The trial court cited Hester v. Cox, 682 So.2d 1381
(Ala.Civ.App. 1996), as authority in denying Charles's motion for attorney fees. In Hester, this court stated:
 "In Alabama, attorney fees are to be awarded only if provided for by statute, contract, or special equity. Hart v. Jackson, 607 So.2d 161 (Ala. 1992). Section 43-8-196, Code 1975, allows for the award of attorney fees against a contestant if the contestant fails in the will contest. In construing the predecessor to § 43-8-196, our supreme court held as follows: `[I]f there is some credible evidence offered by the contestant in support of the theory of the contest, the contestant is not to be charged with paying the attorneys' fees of the proponent.' Bleidt v. Kantor, 412 So.2d 769 (Ala. 1982)."
682 So.2d at 1382. Because we find that Bailey and Pearson offered credible evidence in support of their theory of this will contest, we conclude that the trial court did not err in failing to award attorney fees in this case. This conclusion is supported by the trial court's denial of Charles's motion for a judgment as a matter of law after Bailey and Pearson's casein-chief and the trial court's denial of Charles's motion to award attorney fees.
For the foregoing reasons, we conclude that the trial court's decision was without error.
APPLICATION GRANTED; OPINION OF SEPTEMBER 14, 2007, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.