[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 622 
Melissa Dawn Pirtle and Anna Dell Prchal, contestants in a will contest involving a document purported to be the will of their grandfather, James F. Miller, appeal from the summary judgment entered in favor of the proponent and sole beneficiary of the will, John Wayne Tucker. Pirtle and Prchal contend that the will was the product of Tucker's undue influence over Miller, that Miller lacked testamentary capacity, and that the will was, for those and for additional reasons, invalid. They argue that the circuit court erred in entering the summary judgment for Tucker because, they say, there existed several questions of material fact. We affirm in part, reverse in part, and remand.
This Court's standard for reviewing a summary judgment is settled:
 "This Court reviews a summary judgment de novo. Turner v. Westhampton Court, L.L.C., 903 So.2d 82, 87 (Ala. 2004). We seek to determine whether the movant has made a prima facie showing that there exists no genuine issue of material fact and has demonstrated that the movant is entitled to a judgment as a matter of law. Turner, supra. In reviewing a summary judgment, this Court reviews the evidence in the light most favorable to the nonmovant. Turner, supra. Once the movant makes a prima facie showing that he is entitled to a summary judgment, the burden shifts to the nonmovant to produce `substantial evidence' creating a genuine issue of material fact. Ala. Code 1975, § 12-21-12; Boss v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). `Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Fla., 547 So.2d 870, 871
(Ala. 1989)."
Muller v. Seeds, 919 So.2d 1174, 1176-77 (Ala. 2005). We apply that same standard in reviewing a summary judgment entered in a will contest. See Allen v. Sconyers, 669 So.2d 113,115 (Ala. 1995). Because *Page 623 
Pirtle and Prchal do not argue on appeal that Tucker failed to meet his prima facie burden, we are concerned only with whether the elements of their claims were supported by substantial evidence.
The undisputed record, viewed in the light most favorable to Pirtle and Prchal, the nonmovants, shows the following facts. The testator, James F. Miller, died on September 11, 2004. Twice widowed and once divorced, Miller lived alone for several years immediately preceding his death. Miller's relationships with his surviving relatives, two sisters and his granddaughters, Pirtle and Prchal, were limited. Pirtle and Prchal both lived in Tennessee, approximately 30 miles from Miller's house in Madison County. Prchal testified that she had a good relationship with Miller and that her visits to Miller's house varied in number between one and several times each year, although she usually did not see him during holidays. When his health began to fail during the last year of his life, Prchal visited him more frequently, and except for a two-month period during which she underwent and recovered from surgery, she saw him several times each month at his house, in the hospital when he was hospitalized, and at the nursing home after he was admitted there. Prchal was with Miller the day before he died. Pirtle saw Miller a couple of times each year and had only a limited knowledge of his daily life. Pirtle did not attempt to contact the hospital or nursing home to check on Miller's condition. Tucker testified that in early 2004, Miller did not know exactly where his granddaughters lived.
Miller and Tucker had been neighbors since approximately 1977. Tucker testified that he "adopted" Miller as a father figure after his own father died and that, during the last 10 years of Miller's life, he and Miller spent time together nearly every day. Pirtle testified that Miller did not talk to her about Tucker until approximately two years before he died. Miller's friend, Patrick Meagher, stated in an affidavit that at some point during his 16-year friendship with Miller, Miller had referred to Tucker as "a g. . d. . . leach," and, referring to Tucker, had once remarked, "He's always wanting something," or words to that effect. Meagher did not specify when Miller made these statements.
Miller was described by his pastor as eccentric. He had no telephone and spent much of his time collecting items and making things out of odd items he found. A motorcycle was Miller's primary means of transportation until he could no longer drive it, approximately one year before his death. The evidence showed that Miller spent much time in a shed in his backyard. Pirtle and Prchal testified that during the last year of his life, Miller moved into the shed. Tucker testified that Miller would work in the shed until he fell asleep and would then move into the house when he woke up in the middle of the night. Prchal described Miller as a "pack rat" who, at times, spent time in jail rather than pay fines for violating certain rules or ordinances regarding the trash and other items in his yard. Pirtle testified that Miller's neighbors complained to her that he would urinate and defecate in his backyard.
Miller had a history of diabetes and heart problems. During the last year of his life, Miller's health had declined, particularly during the last six months. Additionally, Miller's eyesight grew bad, to the point that he had difficulty reading. In early 2004, when Miller could no longer drive his motorcycle, he became dependent upon Tucker for transportation. Tucker often took Miller with him while he attended to his own business. Miller came to depend on Tucker for at least two of his *Page 624 
meals each day, and beginning in March 2004 Tucker made sure that Miller took his medications. Tucker frequently checked on Miller late at night. Pirtle and Prchal did not complain about Tucker's increasing care of Miller; they were grateful for his help because they did not live nearby.
Miller's accountant, Brooks Gentle, who had prepared Miller's income tax returns for approximately 15 years, testified that when he prepared Miller's 2003 tax returns in mid-March 2004, Miller was "an average person like everyone else" and acted the same way as he had in previous years. Gentle testified that Tucker did accompany Miller to the office on that occasion.
In February 2004, when Miller and Tucker were at an office-supply store, Miller purchased a "will kit." Tucker testified that in March 2004, Miller asked if Tucker's wife would type his will. She did so on a computer at her and Tucker's house. Miller did not execute the will when it was prepared. Tucker further testified that he never talked with Miller about the will before Miller executed it, and never saw it when his wife prepared it or before it was executed.
The will consists of one page of text and a separate signature page. The size and style of the font on the signature page is different from the size and style of the font of the text of the will. When questioned about the discrepancy, Tucker explained that his wife had typed the page of text and that Miller had used a form from the will kit for the signature page.
The will appoints Tucker as Miller's personal representative and gives Miller's entire estate to Tucker. The will also contains the following statements: "Should either of the granddaughters contest this will they shall be automatically removed as a legal heir," and "I hereby declare that this Will and Testament is not made as the result of a contract of understanding with any other person but solely of my own free will." Tucker testified that Miller discussed with him his appointment as personal representative of Miller's estate but not the disposition of his property; Miller told Tucker only that he did not want his sisters to have anything and that he did not want Pirtle and Prchal to be in his house or to see how he had "collected things."
Tucker testified that Miller told him both before and after he executed the will that he wanted Pirtle and Prchal to each have $50,000 from one of his bank accounts. Tucker also testified that in April 2004 Miller stated that he wanted Tucker "to supply [Pirtle and Prchal] with some monies, whatever was left, over a period of five years." Tucker understood Miller to mean that Pirtle and Prchal were to have whatever money remained after he died. Prchal testified that her grandfather was the type of person who would have told her that he was disinheriting her if he was doing so and that he never told her that.
When Tucker's wife typed Miller's will, she also prepared a power of attorney appointing Tucker as Miller's attorney in fact. As with the will, the size and style of the font of the signature page for the power of attorney was different from the size and style of the font on the first page, and Tucker explained that the signature page was a form from the will kit. According to Tucker, he and Miller discussed the terms of the power of attorney, but Miller did not execute the power of attorney when it was prepared.
Tucker testified that in April 2004 Miller had a "real downfall" in health, and he was frequently "in and out of the hospital." Miller's medical records show that he lost 20 pounds between April 2004 and July *Page 625 
2004. Tucker transported Miller to and from the hospital and doctor's offices and cared for him while he recuperated. In April 2004, Tucker began going into the doctors' examination rooms with Miller. The record shows that Miller underwent a colonoscopy in mid-April 2004 and that he was hospitalized on April 23 for a few days and again on April 30. It is undisputed that Tucker did not always notify Miller's family when Miller was hospitalized.
Miller was hospitalized on April 23, 2004, because of shortness of breath and weight loss; he was confused, disoriented, and noncooperative with the hospital staff to the extent that he had to be restrained. The "history and physical" records for that hospitalization noted that he had not been able to care for himself for a week before he was admitted. Prchal testified that when she visited Miller on April 25, 2004, he could carry on a conversation, but he was weak, had trouble breathing and expressing himself, would lose his train of thought, and made statements about things that were not there. Pirtle and Prchal also testified that on April 25, Miller told them that he wanted them to "have everything." They testified that, at that time, Miller was of sound mind and competent to decide that he wanted them to "have everything." Although she could not remember when the conversation took place, Prchal also testified that while she was subsequently visiting him at the shed in his backyard, Miller told her he wanted her and Pirtle to have everything. Miller was discharged on April 28, 2004, to care for himself at home.
Miller was readmitted to the hospital on April 30, 2004, with severe bleeding as a result of his colonoscopy. The medical records in evidence for that hospitalization do not mention the confusion, disorientation, and noncooperation mentioned in the records of the April 23 hospitalization, and they describe Miller as "alert, coherent, [and] well oriented to time." These records, including Miller's chart for May 3, 2004, consistently describe Miller as "Alert oriented x3." Miller was discharged to "self-care" on May 3, 2004.
Tucker testified that on May 4, 2004, one day following Miller's discharge from the hospital, Miller asked Tucker to drive him to his accountant's office to execute his will. The men went to the office of Mildred Moorehead, a local accountant who was also a notary. Brooks Gentle was an accountant in Moorehead's office, and through his relationship with Gentle, Miller had known Moorehead for at least five years. Miller signed the will in Tucker's presence in a small room in Moorehead's office. Moorehead testified that Tucker did not take part in or interfere with the execution of the will. Moorehead testified that Miller seemed like "just a normal person" and that she was "sure" he was of sound mind. She stated that he did not stay long at her office. Moorehead did not question Miller about the contents of the document he executed; however, she did ask Miller if he understood what he was signing, and he responded, "[O]f course I know what I'm signing."
Two different copies of the signature page of the will exist. One contains only Miller's signature and Moorehead's notarization. The other contains Miller's signature, Moorehead's notarization, and the signatures of two witnesses, who, the evidence showed, were Moorehead's employees. Moorehead testified that she recalled seeing the witnesses sign the will but stated that she did not know whether they signed the will before or after Miller had signed. The witnesses' signatures themselves are not dated, but the signature block contains the following statement: "The testator has signed this will at the end and on each other separate page, and *Page 626 
has declared or signified in our presence that it is his/her last will and testament, and in the presence of the testator and each other we have hereunto subscribed our names this __ day of ___ 20 __."
Tucker testified that Miller gave him a copy of the executed will in a folder and told him to keep it and that he did not open the folder until Miller had died. He testified that Miller had no will before May 4, 2004. Tucker never told Miller's family that Miller had executed a will. Prchal testified that Miller told her in July 2004 that he did not have a will.
On the same day Miller executed the will, he signed the power of attorney Tucker's wife had prepared, appointing Tucker as his attorney in fact. Tucker subsequently used the power of attorney to handle Miller's financial affairs. Tucker closed bank accounts, transferred funds between accounts, and helped Miller pay bills. He also arranged for two certificates of deposit, worth $180,000 and $25,000, respectively, to be transferred from Miller's sole ownership to ownership by him and Miller jointly with right of survivorship. Tucker stated that he had the certificates transferred to his name and Miller's name at Miller's instruction.
Miller was hospitalized from July 28 to August 17, 2004. His medical records from this time show that he was experiencing confusion and dementia. According to Miller's admission records, Tucker used the power of attorney to give the hospital a "do-not-resuscitate" order, to be used if Miller's health worsened. An August 7 physician's consultation report included in the hospital records reveals that Miller was "incompetent to make any decision, including those related to his medical care" and that Miller's "friend," Tucker, "reported that he [had been] unable to make decisions for the past several months." Although it is unclear from the testimony, the medical records reveal that Miller was released from the hospitalization to a nursing home. The report contains the following statement:
 "At the time of discharge the patient was extremely weak. He [was] not able to help himself. He was being advised to go to a rehabilitation nursing home. . . . I talked to the patient's granddaughter who came to see him a few times but does not want to take care of full responsibility for his placement. His caretaker Mr. Tucker who seems to have power of attorney is willing to take care of him and he is agreeable for him to go to [a] short term rehabilitation nursing home."
The nurses in the hospital advised Pirtle that, pursuant to the power of attorney, Tucker had instructed the hospital to notify only him when Miller was admitted or discharged. The hospital and/or nursing home had refused to show Miller's family the power of attorney, and they went to Tucker's house in order to read it. While Miller was in the nursing home, Tucker, at the request of the nursing home administration, obtained a second power of attorney drafted by Tucker's lawyer.
Miller was hospitalized again on August 22, 2004, presenting with malnourishment, dementia, and chronic illness. Miller died on September 11, 2004. Tucker left messages on the telephone answering machine for Pirtle or Prchal advising them that Miller had died. When he did not immediately hear back from them, he planned Miller's funeral without the family's involvement. Tucker testified that he also left a telephone message for either Pirtle or Prchal in which he told her Miller wanted her and her sister each to have $50,000 disbursed over a five-year period, but that he wanted to give them the full amount immediately. Pirtle testified that she actually spoke with Tucker, and he advised *Page 627 
her that she and Prchal were each to have $100,000 paid to them over a five-year period.
Tucker subsequently filed a petition to probate the will with the Probate Court of Madison County. After several intermediate filings, Pirtle and Prchal filed a petition to remove the proceedings to the Madison Circuit Court and filed a complaint contesting the will. They asserted that the will had not been properly executed, that the will was the product of undue influence on Tucker's part, and that Miller lacked testamentary capacity. Tucker subsequently filed a motion for a summary judgment. Pirtle and Prchal did not file a brief in response to Tucker's motion, but they did submit additional evidence. Following a hearing the circuit court entered a summary judgment in Tucker's favor. Pirtle and Prchal filed a Rule 59, Ala. R. Civ. P., motion and a brief in support of the motion, asking the circuit court to alter, amend, or vacate the judgment. In their Rule 59 motion, Pirtle and Prchal also raised the argument that Miller's will did not reflect his true intent in disposing of his property. Their motion was subsequently denied by operation of law, and Pirtle and Prchal appealed.
 I. Was the Will Properly Executed?
Pirtle and Prchal argue that they presented substantial evidence showing that the will is invalid because it was not properly witnessed. They assert that because there existed a copy of the signature page containing only Miller's signature and Moorehead's notarization, a jury could infer that the witnesses did not see Miller sign or acknowledge the will. Tucker argues that because their argument is based upon impermissible speculation, the circuit court's judgment was proper in this regard.
In Ala. Code 1975, § 43-8-131, the legislature has stated the requirements for the execution and witnessing of a will:
 "Except as provided within section 43-8-135 [not applicable here], every will shall be in writing signed by the testator or in the testator's name by some other person in the testator's presence and by his direction, and shall be signed by at least two persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will."[1]
In order to overturn the summary judgment on the basis that the will was not properly executed, Pirtle and Prchal must show by substantial evidence that the witnesses did not see "the signing or [Miller's] acknowledgment of the signature or of the will."
The evidence showed that the notary saw Miller sign the will; that she notarized the will; that her employees signed the will as witnesses on the same day; and that Miller did not stay at the notary's office very long. Additionally, the witnesses attested to the following statement: "The testator has signed this will at the end and on each other separate page, and has declared or signified in our presence that it is his/her last will and testament, and in the presence of the testator and each other we have hereunto subscribed our names this __ day of ___, 20 __." The record does not reveal whether the witnesses did or did not see Miller sign or acknowledge the will. Pirtle and Prchal *Page 628 
offered no testimony from the witnesses themselves, and the notary was not asked during her deposition whether the witnesses were present when Miller signed the will or whether he acknowledged signing it in their presence. Pirtle and Prchal argue that a summary judgment was improper because, they argue, a jury could infer that the witnesses signed the will after Miller had left, and, based on that inference, could infer that the witnesses did not see him sign or acknowledge it.
We have held:
 "An `inference' is a reasonable deduction of fact, unknown or unproved, from a fact that is known or proved. See, Malone Freight Lines, Inc. v. McCardle, 277 Ala. 100, 167 So.2d 274 (1964). `[A]n inference cannot be derived from another inference.' Malone, 277 Ala. at 107, 167 So.2d at 281. An inference must be based on a known or proved fact. Id."
Khirieh v. State Farm Mut. Auto. Ins. Co.,594 So.2d 1220, 1224 (Ala. 1992); accord Systrends, Inc. v. Group 8760,L.L.C., 959 So.2d 1052 (Ala. 2006). The inference upon which Pirtle and Prchal rely — that the witnesses did not see Miller sign or acknowledge the document — is not based on known or proved facts, but upon an inference that Miller left the notary's office before the witnesses signed Miller's will. Such an inference is not based on substantial evidence sufficient to withstand a summary-judgment motion. Furthermore, the witnesses signed a statement attesting that Miller had signed or acknowledged in their presence signing the will. Accordingly, the circuit court correctly entered a summary judgment as to this issue.
 II. Was the Will the Product of Undue Influence?
Pirtle and Prchal next contend that they presented substantial evidence showing that the will was the product of Tucker's undue influence. This Court has held:
 "A presumption of undue influence arises when: (1) there is a confidential relationship between a favored beneficiary and the testator, (2) the influence of the beneficiary is dominant and controlling in that relationship, and (3) there is undue activity by the beneficiary in procuring the execution of the will."
Hayes v. Apperson, 826 So.2d 798, 802 (Ala. 2002); accord Allen v. Sconyers, 669 So.2d 113, 117
(Ala. 1995). In considering these elements, this Court has recognized:
 "`[I]t is next to impossible to produce direct evidence of the exercise of undue influence over another person. Frequently the best evidence which can be offered for either [the] proponent [of a will] or [the] contestant is circumstantial, tending only to support inferences which can be drawn therefrom.' Smith v. Moore, 278 Ala. 173, 177, 176 So.2d 868, 871 (1965); see also Crump v. Moss, 517 So.2d at 612 (noting that the evidence required `to raise a presumption of undue influence' can be either direct or circumstantial)."
Ex parte Henderson, 732 So.2d 295, 299 (Ala. 1999) (bracketed language in original). Additionally, "a trial court should not look at individual facts or evidence in isolation in determining whether the evidence supports the element of undue influence . . ." Hayes, 826 So.2d at 803.
 "[T]he facts shown by the evidence are not considered in a vacuum; rather, `each fact should be considered in the context of the entire situation and in light of the other two criteria for determining undue influence.' Crump [v. Moss], 517 So.2d [609] at 613 [(Ala. 1987)]."
Henderson, 732 So.2d at 299. Keeping in mind these principles, we review each element to determine whether Pirtle and *Page 629 
Prchal presented substantial evidence creating a genuine issue of material fact as to whether Tucker exerted undue influence over Miller.
 A. A confidential relationship between a favored beneficiary and the testator
The parties stipulated that Tucker and Miller had a confidential relationship. They dispute whether there was substantial evidence showing that Tucker was a favored beneficiary under Miller's will. This Court has defined a favored beneficiary as
 "[o]ne who, in the circumstances of the particular case, has been favored over others having equal claim to the testator's bounty. An unnatural discrimination, leading to a natural inference that advantage has been taken by one in position so to do; and shown to have been busy in getting such will executed."
Cook v. Morton, 241 Ala. 188, 192, 1 So.2d 890, 892
(1941).
Citing Clifton v. Clifton, 529 So.2d 980, 983
(Ala. 1988), in which this Court stated that the "`equal claim' of others refers not to the laws of descent and distribution, but to the facts of the particular case," and Windham v.Pope, 474 So.2d 1075 (Ala. 1985), Tucker asserts that there is no evidence indicating that Pirtle and Prchal had an equal claim to Miller's bounty or that any discrimination in Tucker's favor was unnatural. According to Tucker, under the particular facts of this case, Pirtle and Prchal's claim was not equal because they had had only minimal contacts with their grandfather, they had not been involved in his daily life, and they had left Miller to Tucker's care. (Tucker's brief at 31-32.)
The statement from Clifton originated from this Court's explanation in Cook, supra, that the fact that a wife received more under a will than she would have under dower and homestead laws was not a determinative test, of whether she was a favored beneficiary. Cook,241 Ala. at 192, 1 So.2d at 892. Instead, the Court reviewed the evidence to see whether the wife "had dominating power over her husband."241 Ala. at 192, 1 So.2d at 892. In light of its original context, this statement does not require us to ignore wholly the fact that Pirtle and Prchal were Miller's closest living issue.
In Windham, this Court reversed a judgment entered on a jury verdict in favor of a will contestant. 474 So.2d at 1076. The testator, a widower with no children, executed a will leaving one parcel of property to the daughter of his brother-in-law. Although the evidence showed that the brother-in-law was present when the testator signed the will and that both he and his daughter had helped the testator with his financial affairs, this Court found that
 "there was no evidence indicating that others had a claim to the testator's sympathy or benevolence which was equal to or greater than the devisee's. . . . The record is devoid of evidence as to who the natural objects of the testator's bounty might have been. He was a widower without children. There was no evidence tending to show that he was closer to some other person or persons than he was to [his brother-in-law's daughter]."
474 So.2d at 1077. Furthermore, because the will devised only one portion of the testator's estate and there was no evidence showing the value of the remaining estate or how it would be distributed, it was "mere speculation to conclude that [the devisee] was to receive a disproportionate share of the estate under the will." 474 So.2d at 1077.
The facts underlying this Court's decision in Windham
differ materially from those of this case. Unlike the testator in Windham, Miller had blood descendants — *Page 630 
his granddaughters, Pirtle and Prchal — who would have inherited Miller's entire estate under Alabama's laws of intestacy. Ala. Code 1975, § 43-8-42. Furthermore, Miller's will devises his entire estate to Tucker, not just one part. We can, therefore, determine that the will significantly favors Tucker over Pirtle and Prchal. Pirtle and Prchal presented evidence indicating that Miller wanted them to have either his entire estate, whatever money was left in his estate, or $100,000. This evidence shows that Pirtle and Prchal were objects of his bounty and raises an inference that their claim to Miller's bounty was equal to Tucker's, whereas inWindham, there existed no evidence on which to make a similar determination. Finally, although it is clear that Tucker helped Miller in the latter stages of Miller's life, the evidence does not show that he helped Miller so much that the "the testamentary disposition [of Miller's entire estate to Tucker] is proper as a matter of law." Armstrong v. McGee,579 So.2d 1310, 1314 (Ala. 1991).
As stated in the definition of favored beneficiary, whether one is a favored beneficiary depends upon the circumstances of the particular case. See also Cleveland v. Central Bank of theSouth, 574 So.2d 741, 744 (Ala. 1990) (finding sufficient evidence that proponent "was a favored beneficiary, particularly when this issue is viewed in the light of the totality of the evidence"). Under the circumstances of this case as revealed in the evidence discussed above, Pirtle and Prchal have presented substantial evidence indicating that they had a claim to Miller's bounty equal to Tucker's and that the will favors Tucker over them. Therefore, there exists a genuine issue of material fact as to whether Tucker was a favored beneficiary.
B. A dominant and controlling relationship
For Pirtle and Prchal to survive a summary-judgment motion, there must be substantial evidence indicating that Tucker's influence over Miller was dominant and controlling in the relationship. In considering what evidence satisfies this requirement, this "Court has held on numerous occasions that the fact that a beneficiary controls the personal, business, and household affairs of a testator is evidence of a dominant and controlling influence." Hayes v. Apperson,826 So.2d at 804 (reversing judgment for proponent of will).
The evidence shows that Tucker provided Miller's sole means of transportation at the end of his life and that Miller was dependent on Tucker for two meals and his medicine each day. Tucker helped Miller pay his bills, ultimately gained power over Miller's financial affairs, and used that power to transfer certificates of deposit worth over $200,000, which benefited himself. Tucker accompanied Miller into his doctors' examination rooms and cared for Miller when he was released from the hospital. During the month preceding the execution of his will, Miller was hospitalized twice; during the first hospitalization, he exhibited signs of confusion, disorientation, and an unwillingness to comply with the hospital staff. Miller had poor eyesight in the months preceding his death and had difficulty reading. Tucker's wife prepared Miller's will and a power of attorney for Miller in Tucker's favor. Tucker did not always inform Miller's family members when he was hospitalized, and after the will was executed, Tucker used the power of attorney to issue a do-not-resuscitate order and to instruct the hospital staff to notify only him when Miller was admitted or released.
The evidence thus shows Tucker's control over Miller's financial and numerous of his personal affairs. When that evidence is coupled with the evidence of Miller's *Page 631 
diminished mental state during his hospitalization the month preceding the execution of the will, a jury could determine that Tucker's influence in the relationship was dominant and controlling. See, e.g., Hayes, 826 So.2d at 804;Allen v. Sconyers, 669 So.2d at 117. Furthermore, although the events occurred after Miller signed the will, we note that the transfer of the certificates of deposit and the do-not-resuscitate order certainly show a controlling influence by Tucker.
This Court has recognized that whether "the beneficiary was the dominant party in the relationship is usually a question of fact for the jury, and the jury may review the often circumstantial evidence as to whether there were controlling influences over the testator's behavior." Sconyers, 669 So.2d at 117; see also Ex parte Helms, 873 So.2d 1139, 1148
(Ala. 2003). Accordingly, although no single piece of evidence in this case is alone sufficient to withstand summary judgment, when taken together the evidence constitutes substantial evidence creating a genuine issue of material fact as to whether Tucker had a dominant and controlling influence in his relationship with Miller. Thus, summary judgment was not appropriate.
 C. Undue activity in procuring the execution of the will
Finally, to survive the summary-judgment motion as to their undue-influence claim, Pirtle and Prchal must present substantial evidence of undue activity by Tucker in procuring the execution of Miller's will. "Undue activity in the procurement or execution of a will may . . . be proved by circumstantial evidence." Sconyers, 669 So.2d at 117. This Court has
 "described this sort of activity in the procurement of a will as being where the primary beneficiary
 "`[is] active in and about the execution and preparation of said will, such as the initiation of the proceedings for the preparation of the will, or participation in such preparation, employing the draftsman, selecting the witness, excluding persons from the testat[or] at or about the time of the execution of the will, concealing the making of the will after it was made, and the like. . . .'"
Hayes, 826 So.2d at 803 (quoting Reed v.Shipp, 293 Ala. 632, 636, 308 So.2d 705, 708 (1975)).
In Hayes, the evidence showed that the proponent had drafted the testator's will; had employed someone whom he had provided with specially lined paper to type the will; had arranged for the execution of the will and had selected the witnesses; and had excluded the testator's friend from the execution of the will. The notary testified that she did not know the nature of the documents being signed, and the testator's brother, who executed a will prepared by the proponent on the same day, stated the same. The proponent was present in the room when the documents were handled and executed and left only when the notary asked the testator if she understood what she was doing. Also, the proponent had previously attempted to have a will prepared and signed by the testator. Under these facts, this Court reversed the trial court's judgment in favor of the proponent, finding that the judgment, which followed a bench trial and had been based on ore tenus evidence, was against the great weight of evidence.826 So.2d at 804.
Additionally, this Court has found substantial evidence of undue activity in the following cases. In Helms, supra, this Court held that the contestants to the will had presented substantial evidence precluding a judgment as a matter of law on *Page 632 
the basis that the proponent had engaged in undue activity to procure the execution of the will; the evidence showed that "the proponents obtained money and property" from the testator; one proponent "suggested the lawyer who drafted the . . . will"; one proponent "must have driven [the testator] to the office where the will was executed"; and "both proponents falsely denied any knowledge of the . . . will. . . ." 873 So.2d at 1149. Similarly, in Sconyers, supra, this Court reversed a summary judgment despite testimony that the testator was "alert" and "intelligent," when the evidence also showed that the testator exhibited signs of Alzheimer's disease days before the execution of the will, the testator's affairs were solely in the hands of the proponent, and the will radically deviated from the testator's previous will. This Court stated: "In light of the circumstances of this case, a jury could infer that the 1992 will's radical deviation from the bequests made in the 1990 will was the product of undue influence." 669 So.2d at 117.
Keeping these precedents in mind, we turn to the evidence presented in this case by Pirtle and Prchal. That evidence shows that Tucker was with Miller when Miller purchased the "will kit." Tucker's wife, whose testimony neither side presented, typed the will, which left Miller's entire estate to Tucker. The will was a radical departure from Miller's statements to Pirtle and Prchal that he wanted them to "have everything" and his statements to Tucker that he wanted Pirtle and Prchal to have "whatever was left." Tucker disclaimed knowledge of the contents of the will and failed to advise Miller's family that he had executed a will. Tucker drove Miller to the notary's office to have the will executed and was present during the execution. Although the notary asked Miller whether he knew what he was signing and he responded that he did, she did not question him about the contents of the document. After it was executed, Miller gave the signed will to Tucker. Additionally, Tucker's wife prepared a power of attorney for Miller appointing Tucker his attorney in fact, which Tucker subsequently used for his own financial gain.
A court does "not look at individual facts or evidence in isolation in determining whether the evidence supports the element of undue influence. . . ." Hayes,826 So.2d at 803. A jury could reasonably infer from the evidence, when viewed in its totality, that Tucker was unduly active in procuring the execution of the will, which left the entirety of Miller's estate to Tucker. A jury could also reasonably infer that Tucker merely acted in accordance with Miller's wishes. Because the evidence, therefore, gives rise to a genuine issue of material fact regarding undue activity, it is a matter to be determined by a jury. Accordingly, Pirtle and Prchal presented substantial evidence supporting each element of their undue-influence claim, and there existed genuine issues of material fact that precluded a summary judgment as to this claim.
III. Did Miller Have Testamentary Capacity?
Pirtle and Prchal next argue that they presented substantial evidence indicating that Miller did not have testamentary capacity at the time he executed the will. We have held that "[e]very person is presumed to have the capacity to make a will." Burns v. Marshall, 767 So.2d 347, 353
(Ala. 2000). The "burden is on the contestant to prove the lack of testamentary capacity." Allen v. Sconyers,669 So.2d at 117.
 "In order to execute a valid will, one must possess *Page 633 
 "`mind and memory sufficient to recall and remember the property she was about to bequeath, and the objects of her bounty, and the disposition which she wished to make — to know and understand the nature and consequences of the business to be performed, and to discern the simple and obvious relation of its elements to each other.'"
Bolan v. Bolan, 611 So.2d 1051, 1057 (Ala. 1993) (quoting Knox v. Knox, 95 Ala. 495, 503, 11 So. 125, 128
(1892)). A "broad evidentiary inquiry" must be made to determine testamentary capacity. Helms, 873 So.2d at 1147. This Court has explained:
 "`"Evidence is competent to prove conduct and language at various times and places indicating an unhealthy mental condition, and the more extensive the view the safer is the determination reached."
 "`Thus, evidence offered as to the mental and physical condition of the testator], either before or immediately after execution of the will, is admissible since it tends to indicate [his] condition when the will was signed. Likewise, testimony regarding the testat[or's] "conversations, deportment, acts, and appearance" has been found to be competent on the issue of testamentary capacity.'"
Sconyers, 669 So.2d at 118 (citations omitted) (quotingFletcher v. DeLoach, 360 So.2d 316, 318 (Ala. 1978), quoting in turn Tucker v. Tucker, 248 Ala. 602, 610,28 So.2d 637, 644 (1946)).
Pirtle and Prchal rely heavily on Miller's living conditions, including his tendency to collect things, the unkept condition of his home, the fact that he apparently lived in a shed in his backyard, and their testimony regarding neighbors' complaints that he urinated and defecated in his yard. Pirtle and Prchal likewise rely heavily on the records of Miller's April 23, 2004, hospitalization, which show that during the two weeks before Miller executed the will, he exhibited signs of confusion and disorientation and was unwilling to comply with health-care workers. They testified that when they visited him on April 25, 2004, Miller was extremely weak and made statements that indicated that he saw things that were not actually there. However, they both testified that, on this same day, when Miller told them he wanted them to "have everything," he was of sound mind and competent to make that decision.
Notably, records from Miller's April 30, 2004, hospitalization immediately preceding his execution of the will show no disorientation or confusion and describe Miller as "[a]lert, coherent, [and] well oriented to time." The records of this hospitalization consistently describe Miller as "alert and oriented x3." Miller was released to his own care just one day before he signed the will. Additionally, the accountant who notarized the will, and who had known Miller for at least five years, testified that on the day he executed the will he seemed "like a normal person."
The evidence regarding Miller's living conditions does not specifically show that he lacked mind and memory sufficient to recall and remember the property he was about to bequeath, the objects of his bounty, and the disposition he wished to make.Bolan, 611 So.2d at 1057. The evidence of Miller's confusion, disorientation, and non-compliance during his hospital stay beginning on April 23, 2004, is undermined both by the medical records immediately preceding the execution of the will, which show Miller as being alert, coherent, and well-oriented, and by Pirtle and Prchal's own testimony that on April 25, 2004, Miller *Page 634 
was competent to decide that he wanted them to have all of his property.
Medical records that postdate Miller's execution of the will show that by July and August 2004 he was experiencing dementia and was unable to make decisions, including decisions regarding his medical care. These records, however, do not reflect Miller's mental condition "immediately after execution of the will," and therefore do not tend "to indicate [his] condition when the will was signed." Sconyers, 669 So.2d at 118. Additionally, these records do not specify that Miller lacked mind and memory sufficient to recall and remember the property he was about to bequeath, the objects of his bounty, and the disposition he wished to make. Bolan,611 So.2d at 1057. Perhaps the strongest evidence of record indicating a lack of testamentary capacity are physician's consultation notes from early August 2004, which show that Tucker advised hospital staff that Miller "was unable to make decisions for the past several months." However, given the ambiguity of the term "several," defined in Black's Law Dictionary 1406 (8th ed.2004) as "more than one or two but not a lot," and the evidence tending to show that Miller was of sound mind when he executed the will, this statement is not substantial evidence indicating that Miller lacked testamentary capacity.
Based on the foregoing, Pirtle and Prchal failed to present substantial evidence indicating that at the time he executed the will Miller lacked mind and memory sufficient to recall and remember the property he was about to bequeath, the objects of his bounty, and the disposition which he wished to make. The circuit court correctly entered a summary judgment as to this claim.
IV. What was Miller's Intent?
Finally, Pirtle and Prchal argue that the will is invalid because, they say, it does not reflect Miller's true intent. They did not raise this assertion in their complaint or at the hearing before the circuit court, but they did assert it in a Rule 59, Ala. R. Civ. P., motion. They argue that because Miller stated that he wanted them to "have everything" and because Tucker admitted that Miller wanted them to have "whatever was left" or $100,000, the will does not reflect Miller's testamentary intent, and should be "deemed invalid" underThurlow v. Berry, 249 Ala. 597, 604, 32 So.2d 526,532-33 (1947), which states:
 "`"The fundamental and cardinal rule in the interpretation of wills is that the intention of the testator, if not inconsistent with some established rule of law or with public policy, must control, and it is the duty of the courts to ascertain such intention and to give force and effect to the scheme that he had in mind for the disposition of his estate." 30 Am. Eng. Ency. Law, (2d Ed.) p. 661.'"
(quoting Castleberry v. Stringer, 176 Ala. 250, 254,57 So. 849, 850 (1912)). Tucker, citing Kershaw v. Kershaw,848 So.2d 942 (Ala. 2002), and deGraaf v. Owen,598 So.2d 892 (Ala. 1992), argues that the will should be presumed valid and the exclusive evidence of Miller's intent absent some ambiguity requiring reference to extrinsic evidence.
Pirtle and Prchal did not properly present their argument regarding intent to the circuit court. Moreover, the rules stated in Thurlow, Kershaw, and deGraaf relate to the construction and interpretation of a will, not its validity. See Thurlow and deGraaf, supra; Parker v.Bozian, 859 So.2d 427, 434-35 (Ala. 2003); Cottingham v.McKee, 821 So.2d 169, 171-72 (Ala. 2001). Because Pirtle and Prchal challenge the validity of the will, their reliance on such a rule is misplaced. Furthermore, we cannot *Page 635 
find any case invalidating a will solely in the face of evidence indicating that a testator's intent conflicts with the provisions of a will. As a result, Tucker was entitled to a summary judgment as to this issue.
Accordingly, we affirm the circuit court's summary judgment as to the claims alleging lack of testamentary capacity and improper execution. We also affirm the circuit court's judgment as to Pirtle and Prchal's argument that the will should be invalidated based solely upon conflicting evidence of Miller's intent. We reverse the circuit court's summary judgment as to the undue-influence claim, and we remand the cause for further proceedings as to that claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and SEE, STUART, and BOLIN, JJ., concur.
[1] Unlike the previous version of the statute, repealed in 1982, § 43-8-131 does not expressly require that the witnesses sign in the testator's presence. See § 43-1-30
(repealed 1982) (requiring that wills be "attested by at least two witnesses, who must subscribe their names thereto in the presence of the testator") (as quoted in Anderson v.Griggs, 402 So.2d 904, 907 (Ala. 1981)).