STUART, Chief Justice.
In appeal no. 1161016, Margaret McGimsey, Cathy Cramer, Barbara McCollum, and Marilyn Busch (hereinafter referred to collectively as "the nieces") appeal from a summary judgment entered by the Jefferson Circuit Court in favor of Lynda Jeanette Gray, individually and as the personal representative of the estate of Thomas Leonard Pitts, deceased, in a will contest they initiated following Pitts's death; the nieces also challenge the trial court's order directing them to reimburse *27 Gray $8,393 for court costs and certain litigation expenses. In appeal no. 1161055, Gray cross-appeals, arguing that the trial court exceeded its discretion by not also entering an award of attorney fees in her favor. We reverse the summary judgment and award of costs made in favor of Gray in appeal no. 1161016 and dismiss appeal no. 1161055.
I.
The nieces' maternal aunt, Margaret Harris Pitts, was married to Pitts until her death in 2004. Margaret and Pitts never had any children; however, they enjoyed close relationships with the nieces, and Pitts and the nieces continued their relationship after Margaret's death. Gray is the daughter of Pitts's half sister and his only living heir. Although she was raised in Texas and spent most of her life there, like the nieces, she maintained a close relationship with Pitts, visiting him at his home in Birmingham at least annually.
In 2007, Gray moved to Alabama to live with Pitts. Gray asserts that she made the move to help care for Pitts; the nieces assert that the move was motivated by Gray's financial problems. Gray initially maintained a part-time job after moving to Alabama; however, when Pitts was hospitalized following a fall in 2009, she stopped working to spend more time helping with his care. The parties all agree that Pitts's health deteriorated following the 2009 fall and that, as a result, he became more dependent on others, particularly Gray.
In August 2010, Pitts was hospitalized as a result of heart and kidney problems. After several weeks in the hospital, Pitts's physician recommended that he be provided with hospice services. Hospice records detailing an October 11, 2010, meeting with Pitts and Gray indicate that unspecified estate issues came up during that meeting, and hospice services subsequently gave Pitts's name and information to Calvin Howard, an attorney who regularly provided pro bono legal services to hospice patients. In November 2010, Howard telephoned Pitts, and, during that initial telephone call and again at a meeting at Pitts's home, Pitts expressed a desire to modify his existing will.[1] Upon examining Pitts's will and codicils, Howard informed Pitts that it would be simpler to draft an entirely new will, and they discussed Pitts's desires in that regard. Howard described this initial meeting at Pitts's house as follows in an affidavit submitted to the trial court:
"Mr. Pitts brought out a prior will and he instructed that the will be changed. I advised him that it would be easier to prepare another will. No one else was present in the room when Mr. Pitts and I were discussing how he wanted his will prepared. He was the sole historian for all information that I obtained in order to prepare his new will; and I drew up the new will exactly as instructed by Mr. Pitts. ... During this first meeting with Mr. Pitts, he was clear with his instructions for the contents of his will, and he was clear with his intent. He knew who his family members were and who he wanted to leave his assets to upon his death. He was of sound mind on this occasion, and was not under the influence of anyone to the best of my judgment *28 and knowledge and belief. He was the only one that was involved in the preparation of his will."
Howard returned to Pitts's home on November 23, 2010, with the will he had prepared at Pitts's direction, which left the entirety of Pitts's estate to Gray. Howard asserts that he privately reviewed and discussed the will with Pitts and that, after Pitts expressed his satisfaction with the will, neighbors were summoned to serve as witnesses, and Pitts executed the document (hereinafter referred to as "the November 2010 will"). Howard described this meeting as follows in his affidavit:
"Mr. Pitts conversed intelligently, freely, and rationally (normally) at all times, and I was confidently satisfied that he was of sound mind and disposing memory on this occasion. He knew what documents he was signing. He knew what his property consisted of and how he wanted it disposed of, and knew who he wanted his disposing beneficiaries to be in his will. It was my judgment and my opinion and belief based on my years of experience that Mr. Pitts was competent to execute the November 23, 2010 last will and testament."
Howard further swore that, although Gray was in the house during both of his meetings with Pitts, she was not part of their conversations and "she was in no position to hear any matter or conversation."
On August 13, 2012, Pitts died. On October 25, 2012, Gray submitted Pitts's November 2010 will to the Jefferson Probate Court, which appointed her the personal representative of Pitts's estate that same day. On December 17, 2012, McGimsey, Cramer, and McCollum initiated the instant will contest pursuant to § 43-8-199, Ala. Code 1975, arguing both that Pitts was mentally incompetent at the time he executed the November 2010 will and that the November 2010 will was the product of undue influence exercised by Gray over him.[2] An acrimonious period of discovery followed, during which both sides sought to impose sanctions upon the other at various times. Those discovery disputes required multiple interventions by the trial court and, along with other issues in the probate court and some health problems that affected the parties and counsel, combined to delay the case for several years.
On March 17, 2017, Gray moved the trial court to enter a summary judgment in her favor, arguing that there were no genuine issues of material fact concerning the nieces' claims; Gray also repeated a previous request that the trial court enter an award in her favor pursuant to the Alabama Litigation Accountability Act, § 12-19-270 et seq., Ala. Code 1975 ("the ALAA"). On April 5, 2017, the nieces filed their response accompanied by evidence that they argued established the existence of factual issues precluding a summary judgment. In light of that evidence, they also argued that an award of attorney fees pursuant to the ALAA was unwarranted.
On April 17, 2017, the trial court entered an order granting Gray's motion for a summary judgment. With regard to the nieces' claim that Pitts was mentally incompetent at the time he executed the November 2010 will, the trial court held that the nieces had "failed to meet their burden of demonstrating Mr. Pitts's lack of testamentary capacity." The trial court similarly held that the nieces had failed to put forth substantial evidence of their undue-influence claim, explaining:
"[O]ne of the prerequisites for a presumption of undue influence is 'undue activity by the beneficiary in procuring the execution of the will.'
*29 Pirtle v. Tucker, 960 So.2d 620, 628 (Ala. 2006), citing Hayes v. Apperson, 826 So.2d 798, 802 (Ala. 2002). As the Supreme Court later explained in McGee v. McGee, 91 So.3d 659, 664 (Ala. 2012) :
" 'Assuming, arguendo, that the proponent of a will is a favored beneficiary, it still must be shown that there was "active interference in procuring the execution of the will." Clifton v. Clifton, 529 So.2d [980,] 984 [ (Ala. 1988) ]. "This activity must be in procuring the execution of the will and more than activity and interest referable to a compliance with or obedience to the voluntary and untrammeled directions of the testat[rix]." Johnson v. Howard, 279 Ala. 16, 21, 181 So.2d 85, 90 (1965).'
"The court again concludes that the [nieces] have failed to present sufficient evidence to establish this required element of their claim. Defendant Gray was involved in none of the discussions between attorney Howard and Mr. Pitts. She was at Mr. Pitts's residence during attorney Howard's two visits but in another room. Her only contact with the attorney was to greet him at the front door when he arrived, but there is no evidence of any communication between the two other than polite small talk before attorney Howard met privately with Mr. Pitts. The testimony of both defendant Gray and attorney Howard reveals no basis to conclude that Gray exerted any undue influence on Mr. Pitts."
The trial court further stated that costs were "taxed as paid."
Gray then moved the trial court to award her costs and attorney fees in the amount of $136,944 pursuant to § 43-8-196, Ala. Code 1975, which provides, in part, that "[t]he costs of any [will] contest under the provisions of this article must be paid by the party contesting if he fails." The nieces opposed the request, arguing, among other things, that § 43-8-196 authorized the award of "costs," not attorney fees. The nieces also moved the trial court to alter, amend, or vacate its summary judgment in favor of Gray. Following a hearing at which the trial court indicated that it would not award attorney fees, Gray submitted a revised motion seeking the reimbursement of various court costs and litigation expenses. On August 1, 2017, the trial court entered an order awarding Gray $8,393 for litigation expenses and court costs, as well as a separate order denying the nieces' motion to alter, amend, or vacate.
On August 11, 2017, the nieces filed their notice of appeal, challenging both the summary judgment entered against them and the award of costs made to Gray. On August 24, 2017, Gray filed a cross-appeal, arguing that the nieces' will contest was frivolous and that she was accordingly entitled to an award of attorney fees.
II.
We first consider the nieces' argument that the trial court erred by entering a summary judgment in favor of Gray on their undue-influence claim.[3] In Muller v. Seeds, 919 So.2d 1174, 1176-77 (Ala. 2005), this Court described its standard for reviewing a summary judgment as follows:
"This Court reviews a summary judgment de novo. Turner v. Westhampton Court, L.L.C., 903 So.2d 82, 87 (Ala. 2004). We seek to determine whether the movant has made a prima facie showing that there exists no genuine *30 issue of material fact and has demonstrated that the movant is entitled to a judgment as a matter of law. Turner, supra. In reviewing a summary judgment, this Court reviews the evidence in the light most favorable to the nonmovant. Turner, supra. Once the movant makes a prima facie showing that he is entitled to a summary judgment, the burden shifts to the nonmovant to produce 'substantial evidence' creating a genuine issue of material fact. Section 12-21-12, Ala. Code 1975; Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). 'Substantial evidence' is 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Fla., 547 So.2d 870, 871 (Ala. 1989)."
In Pirtle v. Tucker, 960 So.2d 620, 622 (Ala. 2006), we confirmed that "[w]e apply that same standard in reviewing a summary judgment entered in a will contest." Thus, in this case, we must determine whether substantial evidence exists to support each of the following elements of the nieces' undue-influence claim:
"(1) that a confidential relationship existed between a favored beneficiary and the testator; (2) that the influence of or for the beneficiary was dominant and controlling in that relationship; and (3) that there was undue activity on the part of the dominant party in procuring the execution of the will."
Clifton v. Clifton, 529 So.2d 980, 983 (Ala. 1988).
With regard to the first element, the record contains evidence indicating that Gray lived with Pitts from 2007 until his death in 2012 and that she frequently attended medical appointments with Pitts during that time and that Gray assisted Pitts with his household affairs following his 2009 fall and hospitalization, writing checks and paying bills on his behalf and otherwise acting as his agent pursuant to a durable power of attorney she held. In support of their argument that this evidence constitutes substantial evidence of a confidential relationship between Gray and Pitts, the nieces cite Allen v. Sconyers, 669 So.2d 113, 117 (Ala. 1995) ("A confidential relationship arises when one comes to rely upon and trust another in one's important affairs."), and Bolan v. Bolan, 611 So.2d 1051, 1056 (Ala. 1993) (concluding that "there can be no doubt that a confidential relationship existed" between a favored beneficiary and the testator where they were together daily for a six-year period preceding the testator's death and the favored beneficiary cooked for and attended to the testator's affairs during that time). The nieces also argue that Gray is indeed a favored beneficiary, that is, "[o]ne who, in the circumstances of the particular case, has been favored over others having equal claim to the testator's bounty," Cook v. Morton, 241 Ala. 188, 192, 1 So.2d 890, 892 (1941), inasmuch as the November 2010 will left Pitts's entire estate to Gray, notwithstanding the undisputed evidence indicating that the nieces also had close relationships with Pitts. See also Morrow v. Helms, 873 So.2d 1151, 1153 (Ala. Civ. App. 2003) (rejecting as "not grounded in Alabama law" the argument that will contestants did not have equal claim to testator's bounty because they were related to testator by marriage instead of blood and stating that " '[t]he "equal claim" of others refers not to the laws of descent and distribution but to the facts of the particular case.' " (quoting Clifton v. Clifton, 529 So.2d at 983 ) ). We agree that the nieces submitted substantial evidence in support of this first element.
*31 The next element that must be proven in an undue-influence claim is that the influence of the favored beneficiary was dominant and controlling in her relationship with the testator. "This Court has recognized that whether 'the beneficiary was the dominant party in the relationship is usually a question of fact for the jury, and the jury may review the often circumstantial evidence as to whether there were controlling influences over the testator's behavior.' " Pirtle, 960 So.2d at 631 (quoting Allen, 669 So.2d at 117 ). As evidence indicating that Gray was the dominant party in her relationship with Pitts, the nieces rely on much of the same evidence they used to establish that Gray had a confidential relationship with Pitts-that she lived with him, assisted with his personal care, and was involved in managing his household and medical affairs-while also emphasizing his poor health in his later years, which, they argue, made Pitts especially susceptible to Gray's control. The nieces have also cited cases in which facts similar to those in this case have been held to create a factual issue regarding a beneficiary's alleged dominance and control. See, e.g., Pirtle, 960 So.2d at 630 (concluding that evidence showing that the testator was dependent upon the favored beneficiary for transportation and meals, that the favored beneficiary helped the testator pay his bills, and that the favored beneficiary accompanied the testator into doctors' examination rooms and cared for him following hospitalization was sufficient to create a genuine issue of material fact as to whether favored beneficiary had a dominant and controlling influence over testator), and Hayes v. Apperson, 826 So.2d 798, 804 (Ala. 2002) (evidence indicating that favored beneficiary handled testator's banking and household affairs and held a power of attorney for the testator, along with evidence of testator's weakness and poor health, was sufficient to indicate that favored beneficiary was dominant and controlling in relationship). The nieces have submitted sufficient evidence to establish a genuine issue of material fact as to whether Gray had a dominant and controlling influence over Pitts.
The final element of an undue-influence claim is whether there was undue activity by the beneficiary in procuring the execution of the will. In fact, this was the only element the trial court addressed in its order entering a summary judgment in favor of Gray, because the trial court's conclusion that the nieces had failed to submit substantial evidence of this element obviated the need to consider the other elements. In reaching this conclusion, the trial court emphasized that Gray did not appear to have been involved in Pitts's discussions with Howard about drafting a new will, stating that "[h]er only contact with the attorney was to greet him at the front door when he arrived, but there is no evidence of any communication between the two other than polite small talk before attorney Howard met privately with Mr. Pitts." The nieces argue that, even if Gray's direct involvement with Howard was so limited, there was still substantial evidence of undue activity on the part of Gray. We agree.
This Court has noted that " 'it is next to impossible to produce direct evidence of the exercise of undue influence over another person. Frequently the best evidence which can be offered ... is circumstantial, tending only to support inferences which can be drawn therefrom.' " Ex parte Henderson, 732 So.2d 295, 299 (Ala. 1999) (quoting Smith v. Moore, 278 Ala. 173, 177, 176 So.2d 868, 871 (1965) ). In Hayes, 826 So.2d at 803, this Court described some of the circumstances evincing undue activity in the procurement or execution *32 of a will as being those where a beneficiary
" '[is] active in and about the execution and preparation of said will, such as the initiation of the proceedings for the preparation of the will, or participation in such preparation, employing the draftsman, selecting the witness, excluding persons from the testat[or] at or about the time of the execution of the will, concealing the making of the will after it was made, and the like ....' "
(Quoting Reed v. Shipp, 293 Ala. 632, 636, 308 So.2d 705, 708 (1975).) As indicated, however, the list is not meant to be exclusive, and this Court has held other circumstances to be relevant to the third element of the undue-influence test as well. See, e.g., Allen, 669 So.2d at 117 (considering a "radical deviation" from the bequests made in a prior will). In sum, it is not the absence or presence of any one factor-such as the favored beneficiary's direct involvement with the attorney drafting the challenged will or her presence at the meetings where that will is discussed or executed-that determines whether there was undue activity by the favored beneficiary in procuring the execution of the will; rather, "each fact should be considered in the context of the entire situation and in light of the other two criteria for determining undue influence." Crump v. Moss, 517 So.2d 609, 613 (Ala. 1987). See also Rabon v. Rabon, 360 So.2d 971, 972 (Ala. 1978) ("A testator can be coerced into making his will by one who remains unseen during its execution.").
To support their assertion that Gray was actively involved in procuring the November 2010 will, the nieces first point to evidence that they argue establishes that Gray was involved in Pitts's estate planning at approximately the same time the November 2010 will was executed-primarily, a draft of a "third codicil" Gray acknowledged typing at Pitts's direction. This draft, which was never executed, is dated 2010 and maintains the same disposition of property as the December 2006 codicil to Pitts's previous will. In a deposition, Gray acknowledged that handwritten notes in the margins of the draft reading "new needed changes" and "not sure how to word this" were in her handwriting, and she explained that the draft was written "because we needed the changes from the will that Wilkens wrote."[4] One of the nieces, Busch, also has stated in an interrogatory response that she was visiting Pitts at the hospital in 2010 when Gray "came to his hospital room and told him she had been to the bank to get all of his legal papers from [a] safe deposit box." Busch further stated that Gray then explained that "they had to go through some things privately."
The nieces also note that Gray has given contradictory testimony regarding the process by which Howard was retained to draft a new will for Pitts. In an affidavit, Gray described Howard's hiring as follows:
"[Pitts] told me that he asked a hospice nurse by the name of Vicki Allums if she knew someone who could prepare a will for him. Vicki gave him the name of Calvin Howard. I was not present when this discussion took place[;] it was between Vicki and [Pitts]. I did not know Calvin Howard nor did I call him to the house to see [Pitts]. I later learned that [Pitts] called Calvin Howard to the home. I was never present at any meeting with Calvin Howard and [Pitts]."
However, a hospice record indicates that both Pitts and Gray were present at the October 2010 meeting with a hospice representative *33 at which estate issues were raised, leading the hospice service to refer Howard to Pitts. During her deposition, Gray acknowledged that, "if [the hospice worker] said I was there, I must have been there or she wouldn't have noted that." Gray also acknowledged during that deposition that, although she was not a participant in the meetings between Howard and Pitts, she did help to arrange the second meeting at which the November 2010 will was executed by visiting the neighbors Pitts had selected as witnesses and making sure the chosen date was convenient for them.
Finally, although Gray and Howard both submitted affidavits stating that Gray was not in the dining room either time Howard met there with Pitts, with Howard even going so far as to state that "[i]t was apparent to me also that she was in no position to hear any matter or conversation between Mr. Pitts and myself," the nieces note that it is undisputed that Gray was in the house at the time, and they argue that they submitted evidence from which a jury could reasonably conclude that she was in a position to monitor Pitts's conversations with Howard even if she was not in the dining room. In her affidavit, Busch stated:
"[Gray] claims that she was not in the dining room when Calvin Howard and [Pitts] initially met regarding changing his will or when he returned to execute the will with [Pitts]. As [Gray] has stated, the dining room adjoins the living room, but there is no wall between them. The dining room also adjoins the kitchen with a door between them. In my experience, conversations in the dining room can easily be heard in both the living room and the kitchen, even if the kitchen door is shut. It is important to note here that [Pitts] was deaf in one ear, and that in his final years, you had to talk to him very loudly. The other room in the living area of the house is the den, which adjoins the kitchen. Based on my own observations, I believe it's probable that dining room conversations with [Pitts] in his later years could be heard in the den."
Busch further stated in that affidavit that, although Pitts had told her that he was leaving his house to Gray, he never mentioned that he was executing a new will, and she learned of the November 2010 will only after his death.
Thus, the nieces have identified evidence indicating (1) that Gray assisted Pitts in an initial attempt to revise his existing will sometime in 2010; (2) that Gray gave conflicting accounts regarding her presence in Pitts's meeting with hospice services that led to Howard contacting Pitts; (3) that Gray helped with the scheduling of the meeting at which the November 2010 will was executed and arranged for the witnesses to be at that meeting; (4) that Gray was in the house both times Howard met with Pitts; and (5) that the nieces were not told about the November 2010 will when it was executed. This evidence is sufficient to establish a genuine issue of material fact with regard to whether there was undue activity on Gray's part in procuring the execution of the November 2010 will. Inasmuch as the nieces have put forth substantial evidence of all three elements of an undue-influence claim, the trial court erred by entering a summary judgment in favor of Gray on that claim, and that judgment is due to be reversed. Moreover, inasmuch as § 43-8-196 provides that a will contestant is liable for the costs of the contest only if the contest "fails," the trial court's judgment is also reversed to the extent it ordered the nieces to reimburse Gray *34 $8,393.[5]
III.
Gray has also filed a cross-appeal, no. 1161055, arguing that the trial court exceeded its discretion by not entering an award of attorney fees in her favor inasmuch as, she alleges, the nieces' will contest was frivolous and without substantial justification. However, because we are reversing the summary judgment entered against the nieces on their undue-influence claim and this cause is being remanded to the trial court for further proceedings, Gray's arguments in this regard are premature, and her cross-appeal is accordingly dismissed.
1161016-REVERSED AND REMANDED.
1161055-APPEAL DISMISSED.
Bolin, Parker, Shaw, Main, Wise, Bryan, and Mendheim, JJ., concur.
Sellers, J., dissents.

Pitts had executed a will on November 3, 2000, which he had modified by codicils executed on February 27, 2001, and December 28, 2006. Pitts's November 2000 will provided generally that Gray would receive 60% of the property in Pitts's estate if Pitts outlived his wife Margaret, while McGimsey, Cramer, and McCollum would each receive 2.5%, and the rest would go to other individuals and charities. The December 2006 codicil modified Pitts's bequests so as to leave 40% of the property in his estate to Gray, and 10% to each of the nieces.

Subsequently, Busch was added as a plaintiff to the action.

The nieces do not argue on appeal that the trial court erred by entering a summary judgment in favor of Gray on their claim that Pitts was mentally incompetent at the time he executed the November 2010 will.

Pitts's earlier will had been prepared by an attorney named Kathrine Wilburn; this appears to be the will Gray is referring to as the "will that Wilkens wrote."

It is accordingly unnecessary for us to consider the nieces' argument that the trial court erred by including certain litigation expenses incurred by Gray in its calculation of "costs" as that term is used in § 43-8-196.